## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

In re:

MAX & ERMA'S RESTAURANT, INC.,

      Debtor.

Case No. 09-27807-MBM

Chapter 11

Related to Doc. Nos. 759, 760

## DISCLOSURE STATEMENT TO ACCOMPANY THE JOINT CHAPTER 11 PLAN PROPOSED BY THE DEBTOR AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS DATED JULY 9, 2010

**LAW OFFICES OF ROBERT O LAMPL**
Robert O Lampl, Esq.
John P. Lacher, Esq.
Elsie R. Lampl, Esq.
960 Penn Avenue, Suite 1200
Pittsburgh, PA 15222
(412) 392-0330

*Counsel to the Debtor*

-and-

**MCGUIREWOODS, LLP**
Mark E. Freedlander, Esq.
Michael J. Roeschenthaler, Esq.
625 Liberty Avenue, 23rd Floor
Pittsburgh, PA 15222
(412) 667-6000

*Counsel to the Official Committee
of Unsecured Creditors*

## IMPORTANT NOTICE

This Disclosure Statement[1] and its related documents are the only documents authorized by the Bankruptcy Court to be used in connection with the solicitation of votes to accept the Plan. No representations have been authorized by the Bankruptcy Court concerning the Debtor, its business operations or the value of its assets, except as explicitly set forth in this Disclosure Statement.

Please refer to the Plan (or, where indicated, certain motions and orders filed with the Bankruptcy Court) for definitions of the capitalized terms used in this Disclosure Statement.

The Plan Proponents reserve the right to file an amended Plan and Disclosure Statement from time to time.

The Plan Proponents urge you to read this Disclosure Statement carefully for a discussion of voting instructions, recovery information, classifications of claims, the history of the Debtor and the Case, the Debtor's business and properties and a summary and analysis of the Plan.

The Plan and Disclosure Statement are not required to be prepared in accordance with federal or state securities laws or other applicable non-bankruptcy law. The Disclosure Statement has been approved by the Bankruptcy Court as containing "adequate information;" however, such approval does not constitute an endorsement of the Plan or Disclosure Statement by the Bankruptcy Court.

The Disclosure Statement contains only a summary of the Plan. This Disclosure Statement is not intended to replace a careful and detailed review of the Plan, but instead, is an aid and supplement to such review. This Disclosure Statement is qualified in its entirety by reference to the Plan and the agreements and documents described therein. If there is a conflict between this Disclosure Statement and the Plan, the provisions of the Plan will govern. You are encouraged to review the full text of the Plan and to read carefully the entire Disclosure Statement, including all exhibits, before deciding how to vote with respect to the Plan.

Except as otherwise indicated, the statements in this Disclosure Statement are made as of July 9, 2010 and the delivery of this Disclosure Statement will not, under any circumstances, imply that the information contained herein is correct at any time after July 9, 2010. Any estimates of claims in this Disclosure Statement may vary from the final amounts of claims allowed by the Bankruptcy Court.

---

[1] Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to them in the Plan (as defined below).

YOU SHOULD NOT CONSTRUE THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. YOU SHOULD, THEREFORE, CONSULT WITH YOUR OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH MATTERS IN CONNECTION WITH THE PLAN, THE SOLICITATION OF VOTES ON THE PLAN AND THE TRANSACTIONS CONTEMPLATED BY THE PLAN.

As to contested matters, adversary proceedings and other actions or threatened actions, this Disclosure Statement is not, and is in no event to be construed as, an admission or stipulation.

# TABLE OF CONTENTS

**Page**

ARTICLE I - INTRODUCTION ...................................................................................... 1

    1.1    Purpose of the Disclosure Statement ................................................................. 1

    1.2    Voting on the Plan ............................................................................................. 2

    1.3    Hearing on Final Approval of Disclosure Statement and Confirmation of the Plan ............................................................................................................... 6

ARTICLE II - GENERAL INFORMATION ..................................................................... 7

    2.1    Overview of Chapter 11 ..................................................................................... 7

    2.2    Description of the Debtor .................................................................................. 7

    2.3    The Acquisition of Max & Erma's by G&R Acquisitions, Inc .......................... 8

    2.4    Events Leading to Chapter 11 Filing ................................................................. 8

ARTICLE III - THE CHAPTER 11 CASE ......................................................................... 9

    3.1    Commencement of the Chapter 11 Case and Related Relief ............................... 9

    3.2    Case Administration .......................................................................................... 9

    3.3    Compliance with the Bankruptcy Code, Bankruptcy Rules, Local Rules and United States Trustee Guidelines ................................................................ 13

ARTICLE IV - SUMMARY AND OVERVIEW OF THE PLAN ....................................... 13

    4.1    Summary .......................................................................................................... 13

    4.2    Classification and Treatment of Allowed Claims and Equity Interests .............. 20

ARTICLE V - MEANS OF IMPLEMENTATION OF THE PLAN ................................... 25

    5.1    Source of Consideration for Plan Distributions ................................................. 25

    5.2    The M&E Trust ................................................................................................. 26

    5.3    Effectuating the Sale ........................................................................................ 31

    5.4    Transfer Taxes .................................................................................................. 32

    5.5    Corporate Action .............................................................................................. 32

    5.6    Vesting of Assets in the M&E Trust .................................................................. 33

    5.7    Distributions .................................................................................................... 33

    5.8    Subrogation Claims .......................................................................................... 33

    5.9    Cancellation of Notes, Instruments, Certificates and Other Documents ............ 33

    5.10    Cancellation of Existing Securities and Agreements. ......................................... 33

    5.11    Release of Liens ............................................................................................... 33

    5.12    Books and Records ........................................................................................... 34

5.13     Closing of Case by Charitable Gift ........................................................ 34

ARTICLE VI -     PROCEDURES FOR DISPUTED CLAIM ................................. 34

6.1     Objections to Claims .................................................................... 34

6.2     No Distribution Pending Allowance ................................................. 34

6.3     Reserve on Account of Disputed Claims ........................................... 35

6.4     Resolution of Disputed Claims ...................................................... 35

6.5     Estimation ............................................................................... 36

6.6     Distributions to Holders of Allowed Claims Upon Disallowance of Disputed Claims ....................................................................... 36

ARTICLE VII -     TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ........................................................... 36

7.1     Rejection of Executory Contracts and Unexpired Leases ..................... 36

7.2     Assumption of Executory Contracts and Unexpired Leases ................. 37

ARTICLE VIII -     CONDITIONS PRECEDENT TO EFFECTIVENESS OF THE PLAN ...... 40

8.1     Conditions Precedent to Effective Date ........................................... 40

8.2     Waiver of Conditions Precedent .................................................... 40

8.3     Effect of Nonoccurrence of Conditions to Effective Date ................... 41

ARTICLE IX -     EFFECT OF CONFIRMATION ................................................ 41

9.1     Vesting of Assets ...................................................................... 41

9.2     Binding Effect .......................................................................... 41

9.3     Discharge of Claims and Termination of Equity Interests .................. 41

9.4     Discharge of the Debtor .............................................................. 42

9.5     Full Release of PNC Bank, as Agent, and the Pre-Petition Lenders ........ 42

9.6     Exculpation ............................................................................. 43

9.7     Preservation of Rights of Action ................................................... 42

9.8     Injunction ............................................................................... 43

9.9     Purchaser Not a Successor ........................................................... 44

ARTICLE X -     RETENTION OF JURISDICTION ........................................... 45

10.1     Jurisdiction by the Bankruptcy Court ............................................. 45

ARTICLE XI -     CRAMDOWN RESERVATION ............................................... 46

11.1     Nonconsensual Confirmation ....................................................... 46

# TABLE OF CONTENTS
## (continued)

ARTICLE XII - MISCELLANEOUS PROVISIONS .................................................... 46

    12.1    Disposition of the Creditors Committee ............................ 46

    12.2    Substantial Consummation ................................................. 46

    12.3    Payment of Statutory Fees ................................................. 47

    12.4    Modification of Sale Documents ........................................ 47

    12.5    Modification of the Plan ..................................................... 47

    12.6    Revocation or Withdrawal of Plan ..................................... 47

    12.7    Fiduciary Obligations of Plan Proponents ......................... 48

    12.8    Courts of Competent Jurisdiction ...................................... 48

    12.9    Severability ......................................................................... 48

    12.10  Governing Law ................................................................... 48

    12.11  Successors and Assigns ...................................................... 49

    12.12  Time .................................................................................... 49

ARTICLE XIII - UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS ........ 49

    13.1    Introduction ........................................................................ 49

    13.2    Certain Material United States Federal Income Tax Consequences to Holders of Claims .............................................................. 50

ARTICLE XIV - ALTERNATIVES TO THE PLAN ................................................. 52

    14.1    Other Chapter 11 Plans ...................................................... 52

    14.2    Liquidation under Chapter 7 of the Bankruptcy Code ....... 52

    14.3    Dismissal of the Chapter 11 Case ...................................... 52

ARTICLE XV - CONFIRMATION REQUIREMENTS ............................................ 53

    15.1    Acceptances Necessary to Confirm the Plan ..................... 53

    15.2    Best Interests of Creditors .................................................. 54

    15.3    Feasibility ........................................................................... 54

    15.4    Confirmation of the Plan .................................................... 54

ARTICLE XVI - CERTAIN RISK FACTORS TO BE CONSIDERED ...................... 54

    16.1    Parties in Interest May Object to the Plan Proponents' Classification of Claims ............................................................................... 55

    16.2    The Plan Proponents May Not Be Able to Secure Confirmation of the Plan ...... 55

16.3   The Plan Proponents May Object to the Amount or Classification of Your Claim.................................................................................................................. 55

16.4   The Sale to the Purchaser May Not Be Approved as Proposed.......................... 55

ARTICLE XVII - WHERE YOU CAN OBTAIN MORE INFORMATION............................ 56

ARTICLE XVIII -CONCLUSION AND RECOMMENDATION........................................... 57

In re

MAX & ERMA'S RESTAURANT, INC.,

Debtor.

Case No. 09-27807-MBM

Chapter 11

## ARTICLE I - INTRODUCTION

### 1.1 Purpose of the Disclosure Statement

Max & Erma's Restaurant, Inc. ("Max & Erma's" or the "Debtor"), the above-captioned debtor and debtor-in-possession, with the Official Committee of Unsecured Creditors (the "Committee" together with the Debtor, the "Plan Proponents") prepared this Disclosure Statement in connection with the Joint Chapter 11 Plan Proposed by the Debtor and the Official Committee of Unsecured Creditors Dated July 9, 2010 (the "Plan"), filed in the Debtor's bankruptcy Case under title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), currently pending in the United States Bankruptcy Court for the Western District of Pennsylvania (the "Bankruptcy Court"). The purpose of the Disclosure Statement is to provide you information of a kind and in sufficient detail that would enable a hypothetical reasonable investor, typical of holders of Claims and Interests of the Classes being solicited to make an informed decision, whether to vote to accept or reject the Plan.

A copy of the Plan (with exhibits) is attached hereto and incorporated herein by reference as Exhibit A. Unless otherwise specifically noted, all capitalized terms utilized herein shall have the meaning ascribed to such terms as set forth in the Plan or the Agreement (as defined in the Plan).

To further assist you in your consideration of the Plan, a copy of the Liquidation Analysis is attached hereto and incorporated herein by reference as Exhibit B. The Liquidation Analysis allows you to compare the proposed restructuring in the Plan to what a liquidation of the Debtor's assets might yield.

You should read this Disclosure Statement, the Plan, the Agreement and the documents and exhibits attached thereto in their entirety before voting on the Plan. No statements or information concerning the Debtor or any other entity described in this Disclosure Statement or the Plan, particularly, but not limited to, the Debtor's financial results, assets or liabilities are authorized by the Plan Proponents other than as set forth in this Disclosure Statement or exhibits hereto.

The financial information set forth in this Disclosure Statement has not been audited by independent certified public accountants, nor has it necessarily been prepared in accordance with generally accepted accounting principles, except as specifically set forth herein. For that reason,

and as a result of the complexity of the financial affairs of the Debtor, the Plan Proponents do not represent or warrant that the information set forth in this Disclosure Statement is without any inaccuracy. To the extent possible, however, the information has been prepared from the Debtor's financial books and records, and every reasonable effort has been made by the Plan Proponents to ensure that all information in this Disclosure Statement has been fairly presented.

### 1.2 Voting on the Plan

Each holder of a Claim or Equity Interest of a Class under the Plan will receive this Disclosure Statement, the Plan and a ballot ("Ballot") for accepting or rejecting the Plan. Any holder of a Claim or Equity Interest whose legal, contractual or equitable rights are altered, modified or changed by the proposed treatment under the Plan is considered "Impaired" and therefore eligible to vote unless the holder is deemed to reject the Plan. Each holder of a Claim or Equity Interest of a Class that is deemed to accept or reject the Plan will not be eligible to vote on the Plan. You should review this Disclosure Statement and the Plan before submitting a ballot to confirm whether you are entitled to vote. Only eligible votes will be counted for Plan confirmation purposes.

---

**Which Classes of Claims are Entitled to Vote on the Plan?**

- Classes of Claims and Equity Interests are entitled to vote on the Plan as follows:

- Claims in Classes 3 and 4 are Unimpaired, are deemed to have accepted the Plan, and are not entitled to vote on the Plan

- Claims in Classes 1, 2, and 5 are Impaired and entitled to vote on the Plan (each a "Voting Class" and together the "Voting Classes")

- Claims in Class 6 and Equity Interests in Class 7 will receive no distribution under the Plan, are deemed to have rejected the Plan, and are not entitled to vote on the Plan

---

For a summary description of the Classes of Claims and Equity Interests and their respective treatment under the Plan, see Article IV below.

Pursuant to the Bankruptcy Code, the Plan will be deemed accepted by an Impaired Class of Claims if the Plan Proponents receive votes accepting the Plan representing at least:

- two-thirds (2/3) of the total dollar amount of the Allowed Claims in the Class that cast a vote; and

- more than one-half (1/2) of the total number of Allowed Claims in the Class that cast a vote.

All properly completed Ballots *actually received* by the Plan Proponents no later than **August [___], 2010 at 5:00 p.m. (EST)** (the "Voting Deadline") will be counted in determining whether each Impaired Class entitled to vote on the Plan has accepted the Plan. All Ballots must

be delivered to and received by the Plan Proponents by the Voting Deadline. Any Ballots received after the Voting Deadline will not be counted.

---

**Voting on the Plan**

***When does the Ballot need to be received?*** The deadline for the receipt by the Plan Proponents of properly completed Ballots is August [___], 2010 at 5:00 p.m. (EST).

***Which Classes may vote?*** Persons may vote to accept or reject the Plan only with respect to Allowed Claims that belong to a Class that is Impaired under the Plan and is not deemed to have accepted or rejected the Plan. **These are Classes 1, 2, and 5**.

***How do I vote on the Plan?*** For a vote to be counted, the Plan Proponents must *actually receive* an original signed copy of the Ballot delivered with this Disclosure Statement. <u>You may not submit votes by facsimile.</u>

***Who should I contact if I have questions or need a Ballot?*** You may contact the Plan Proponents at the addresses or phone numbers listed below.

---

This Disclosure Statement and the Plan are the only materials that you should use in determining how to vote on the Plan. The Plan Proponents believe that approval of the Plan provides the greatest return to holders of Claims in the Voting Classes.

---

# Voting Recommendations

The Plan Proponents believe that the Plan presents the best opportunity for holders of Claims to maximize their respective recoveries. **Both the Debtor and the Committee encourage holders of Claims to vote to <u>*ACCEPT*</u> the Plan.**

---

The Ballots have been specifically designed for the purpose of soliciting votes on the Plan from each Class entitled to vote. For this reason, in voting on the Plan, please use only the Ballot sent to you with this Disclosure Statement. If you hold Claims in more than one Class, you must use a separate Ballot for voting with respect to each Class of Claims that you hold. If you believe you have received the incorrect form of Ballot, you need another Ballot or you have any questions concerning the form of Ballot, please contact the Plan Proponents in advance of the Voting Deadline.

Please complete and sign your Ballot and return it to the Plan Proponents at the following address:

| By mail or overnight delivery: |
|:---:|
| McGuireWoods LLP |
| Attn: Michael J. Roeschenthaler, Esquire |
| 625 Liberty Avenue, 23rd Floor |
| Pittsburgh, PA 15222 |
| Tel: (412) 667-7905 |

The Plan Proponents will prepare and file with the Bankruptcy Court a certification of the results of the voting on the Plan on a Class-by-Class basis.

Additional copies of the Ballots, this Disclosure Statement and the Plan are available upon request made to the Plan Proponents. Please contact the Plan Proponents at the address and telephone number listed above with any questions relating to voting on the Plan.

---

**Your Vote is Important**

Your vote on the Plan is important because:

- Under the Bankruptcy Code, a chapter 11 plan can only be confirmed if certain majorities in dollar amount and number of claims (as described above) of each voting class under the plan vote to accept the plan, unless the "cram down" provisions of the Bankruptcy Code are used.

- Under the Bankruptcy Code, only the votes of those holders of claims or interests who actually submit votes on a plan are counted in determining whether the specified majority of votes in favor of the plan have been received.

- If you are eligible to vote with respect to a Claim and do not deliver a properly completed Ballot relating to that Claim by the Voting Deadline, you will be deemed to have abstained from voting with respect to that Claim and your eligibility to vote with respect to that Claim will not be considered in determining the number and dollar amount of Ballots needed to make up the specified majority of that Claim's Class for the purpose of approving the Plan.

---

All pleadings and other documents referred to in this Disclosure Statement as being on file with the Bankruptcy Court are available for inspection and review during normal business hours at the Office of the Clerk of the United States Bankruptcy Court for the Western District of Pennsylvania, 5414 U.S. Steel Tower, 600 Grant Street, Pittsburgh, PA 15219; telephone (412) 644-2700, or on-line at the Bankruptcy Court's website: http://www.pawb.uscourts.gov (PACER-CM/ECF account required for on-line viewing of documents).

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN AND OTHER DOCUMENTS RELATING TO THE PLAN. WHILE THE PLAN PROPONENTS SUBMIT THAT THOSE SUMMARIES PROVIDE ADEQUATE INFORMATION WITH RESPECT TO THE DOCUMENTS SUMMARIZED, THESE SUMMARIES ARE QUALIFIED BY THE COMPLETE TEXT OF SUCH DOCUMENTS. IF ANY INCONSISTENCIES EXIST BETWEEN THE TERMS AND PROVISIONS OF THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR OTHER DOCUMENTS DESCRIBED HEREIN, THE TERMS AND PROVISIONS OF THE PLAN AND OTHER DOCUMENTS ARE CONTROLLING. EACH HOLDER OF AN IMPAIRED CLAIM SHOULD REVIEW THE ENTIRE PLAN AND ALL RELATED DOCUMENTS AND SEEK THE ADVICE OF ITS OWN COUNSEL BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. ANY CHANGES TO THESE DOCUMENTS WILL BE DESCRIBED AT THE HEARING ON THE CONFIRMATION OF THE PLAN.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON BY ANY PERSON OR ENTITY FOR ANY PURPOSE OTHER THAN BY HOLDERS OF IMPAIRED CLAIMS OR INTERESTS ENTITLED TO VOTE ON THE PLAN IN DETERMINING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. NOTHING CONTAINED IN THIS DISCLOSURE STATEMENT WILL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON HOLDERS OF CLAIMS OR EQUITY INTERESTS.

EXCEPT TO THE EXTENT OTHERWISE SPECIFICALLY NOTED HEREIN, THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS GENERALLY INTENDED TO DESCRIBE FACTS AND CIRCUMSTANCES ONLY AS OF JULY 9 2010 AND NEITHER THE DELIVERY OF THIS DISCLOSURE STATEMENT NOR THE CONFIRMATION OF THE PLAN WILL CREATE ANY IMPLICATION, UNDER ANY CIRCUMSTANCES, THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS CORRECT AT ANY TIME AFTER JULY 9, 2010 OR THAT THE PLAN PROPONENTS WILL BE UNDER ANY OBLIGATION TO UPDATE SUCH INFORMATION IN THE FUTURE.

THE PLAN PROPONENTS SUBMIT THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTEREST OF EVERY CREDITOR AND RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.

### 1.3 Hearing on Final Approval of Disclosure Statement and Confirmation of the Plan

The Bankruptcy Court by order dated July [__], 2010 approved the Joint Expedited Motion of the Debtor and Committee to Consolidate Hearing on Final Approval of Disclosure Statement and Confirmation of Plan ("Hearing Consolidation Order"), and in accordance with the Hearing Consolidation Order will hold a hearing on final approval of the Disclosure Statement and confirmation of the Plan (the "Consolidated Confirmation Hearing") at the following time and place:

| Consolidated Confirmation Hearing |
| --- |
| **Date and Time:** Commencing at [____:00 _.m.] (prevailing EST), on August [__], 2010 |
| **Place:** United States Bankruptcy Court for the Western District of Pennsylvania (Pittsburgh Division), Courtroom B, 54th Floor, US Steel Tower, 600 Grant Street, Pittsburgh, Pennsylvania 15219 |
| **Judge:** M. Bruce McCullough, United States Bankruptcy Judge, Western District of Pennsylvania (Pittsburgh Division) |

At the Consolidated Confirmation Hearing, the Plan Proponents will seek an order approving the Disclosure Statement on a final basis and confirming the Plan. At the Consolidated Confirmation Hearing, the Bankruptcy Court will:

- Determine whether sufficient majorities in number and dollar amount, as applicable, from each Voting Class have delivered properly executed votes accepting the Plan to approve the Plan;

- Hear and determine objections, if any, to the Plan and to confirmation of the Plan that have not been previously disposed of;

- Determine whether the Plan meets the confirmation requirements of the Bankruptcy Code;

- Determine whether to confirm the Plan and authorize and approve the transaction contemplated by the Agreement; and

- Approve the Disclosure Statement as containing adequate information on a final basis.

**Any objection to confirmation of the Plan must be in writing, filed with the Bankruptcy Court and served so as to be actually received on or before August [__], 2010 at 5:00 p.m. (EST) by the following persons:**

- Counsel for the Debtor, Law Offices of Robert O Lampl, 960 Penn Avenue, Suite 1200, Pittsburgh, Pennsylvania 15222, Attn: Robert O Lampl, Esquire;

- Counsel for the Committee, McGuireWoods LLP, 625 Liberty Avenue, 23rd Floor, Pittsburgh, Pennsylvania 15222, Attn: Mark E. Freedlander, Esquire; and

- The Office of the United States Trustee for the Western District of Pennsylvania, Liberty Center, Suite 970, Pittsburgh, Pennsylvania 15222, Attn: Heather A. Sprague, Esquire.

## ARTICLE II - GENERAL INFORMATION

### 2.1 Overview of Chapter 11

Chapter 11 is the primary business reorganization chapter of the Bankruptcy Code. Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize its business and affairs for itself, its creditors and its equity interest holders. In addition to permitting the rehabilitation of a debtor, another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated equity interest holders with respect to distributions of the value of a debtor's assets.

The commencement of a chapter 11 case creates a bankruptcy estate that is comprised of all of the legal and equitable interests of a debtor as of the Petition Date of the chapter 11 case. The Bankruptcy Code provides that a debtor may continue to operate its business and affairs and remain in possession of its property as a "debtor-in-possession."

The consummation of a plan of reorganization is the fundamental objective of a chapter 11 reorganization case. A plan of reorganization sets forth the means for restructuring a debtor's business and satisfying claims against and interests in a debtor. Confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under the plan, any person acquiring property under the plan, and any creditor or equity interest holder of a debtor. Pursuant to section 1123(b)(4) of the Bankruptcy Code, a plan of reorganization may provide for the sale of all or substantially all of the property of the debtor's bankruptcy estate and the distribution of the proceeds of such sale among holders of claims or interests. Furthermore, section 1129(a)(11) of the Bankruptcy Code explicitly states that a plan of reorganization may provide for the liquidation of the debtor.

Certain holders of claims against and interests in a debtor are permitted to vote to accept or reject the plan. Prior to soliciting acceptances of the proposed plan, however, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding the plan. The Plan Proponents are submitting this Disclosure Statement to holders of claims against and equity interests in the Debtor to satisfy the requirements of section 1125 of the Bankruptcy Code.

### 2.2 Description of the Debtor

Max & Erma's is a leading regional casual dining brand with 61 company-owned and franchised stores located mainly in the Midwest and Eastern United States (Michigan, Ohio, Pennsylvania and the surrounding states). Max & Erma's benefits from a 38 year history as "The Neighborhood Gathering Place" with a strong reputation for fresh, great-tasting food

served with the highest customer service in a warm, fun and comfortable environment.  Max & Erma's is well-known for its gourmet burgers, overstuffed sandwiches, homemade pasta dishes, char-grilled steaks and chicken specialties, among other things.

The 61 company-owned locations generated average unit volumes of approximately $2.0 million as of the fiscal year ended 2009, and the stable franchise base of 26 stores includes highly visible locations at the Detroit, Cleveland, Columbus and Pittsburgh airports.  Max & Erma's restaurants are primarily located in suburban markets (with a few urban locations, including downtown Pittsburgh), mostly in high traffic areas surrounded by retail or other restaurants targeting similar demographics.

For the fiscal year ending October 26, 2008, Max & Erma's reported gross sales exceeded $168.5 million, its 4-wall adjusted EBITDA exceeded $15.9 million and it adjusted consolidated EBITDA exceeded $7.8 million.  For the fiscal year ending October 25, 2009, Max & Erma's gross sales were approximately $144.0 million with adjusted EBITDA of approximately $3.7 million.  Fiscal year 2009 figures were not audited nor were they necessarily calculated in strict accordance with GAAP.

### 2.3     The Acquisition of Max & Erma's by G&R Acquisitions, Inc.

Prior to April 2008, Max & Erma's was a publically-traded company (NASDAQ:MAXE).  On April 28, 2008, Max & Erma's entered into an Agreement and Plan of Merger (the "Merger Agreement") with G&R Acquisition, Inc. ("G&R Acquisition") and G&R Acquisition Subsidiary, Inc., a wholly-owned subsidiary of G&R Acquisition ("G&R Subsidiary). Under the Merger Agreement, G&R Subsidiary was merged with and into Max & Erma's (the "Merger"), with Max & Erma's continuing after the Merger as the surviving corporation and a subsidiary of G&R Acquisition. At the effective time of the Merger, each issued and outstanding share of the Company's common stock (the "Common Stock") was converted into the right to receive $4.00 in cash, without interest (the "Merger Consideration"). In addition, each holder of a vested option to purchase shares of Common Stock were entitled to receive a per share cash payment equal to the amount by which the Merger Consideration exceeded the exercise price of such option (if any), less any applicable withholding taxes.

### 2.4     Events Leading to Chapter 11 Filing

In September and October of 2009, PNC Bank, National Association, successor by merger to National City Bank, The Huntington Bank and Park National Bank (the "Pre-Petition Lenders") obtained judgments totaling approximately $15.9 million against Max & Erma's, G&R Acquisition and Damon's International, Inc. (a guarantor of the Pre-Petition Bank Debt). On October 21, 2009, the Franklin County Court of Common Pleas in Columbus, Ohio ordered the appointment of a receiver to manage the affairs of Max & Erma's; and Cohen Capital Advisors LLC, a Cleveland, OH based consulting firm was appointed receiver.  Two days after the appointment of the receiver, Max & Erma's filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Bankruptcy Court.

# **ARTICLE III - THE CHAPTER 11 CASE**

### 3.1    Commencement of the Chapter 11 Case and Related Relief

On October 23, 2009 (the "Petition Date"), the Debtor filed its petition for relief under chapter 11 of the Bankruptcy Code. As discussed below, Mark A. Roberts of Alvarez & Marsal North America, LLC ("A&M") was engaged to manage the Debtor's operations as chief restructuring officer and chief executive officer of the Debtor, and Debtor continues to operate under the supervision and control of A&M.

#### (a)    Continuation of Business; Stay of Litigation and Collection Efforts

Subsequent to the Petition Date, the Debtor continues to operate subject to the supervision of the Bankruptcy Court and in accordance with the Bankruptcy Code. The Debtor is authorized to operate its business in the ordinary course, with transactions outside the ordinary course of business requiring Bankruptcy Court approval. An immediate effect of the filing of the Debtor's bankruptcy petition was the imposition of the automatic stay under the Bankruptcy Code, which, with limited exceptions, enjoins the commencement or continuation of all collection efforts by creditors, the enforcement of liens against property of the Debtor, and the continuation of litigation against the Debtor. This relief provides the Debtor with the "breathing room" necessary to assess its business and develop a chapter 11 plan. The automatic stay remains in effect, unless modified by the Bankruptcy Court, until consummation of a chapter 11 plan.

### 3.2    Case Administration

#### (a)    Retention of Professionals by Max & Erma's

The Bankruptcy Court has authorized the retention of various professionals by the Debtor, including: (i) Robert O Lampl as bankruptcy counsel (Docket No. 13); (ii) Porter Wright Morris & Arthur, LLP as special counsel (Docket No. 368); (iii) GBQ Partners as independent auditors and business & tax advisors (Docket No. 320); and (iv) William Blair & Co., LLC ("William Blair") as investment banker (Docket No. 418).

#### (b)    Use of Cash Collateral

On November 2, 2009, the Debtor, along with the Pre-Petition Lenders, filed the Consent Motion for an Order Approving Use of Cash Collateral (the "Cash Collateral Motion") (Docket No. 36). The Cash Collateral Motion, in pertinent part, requested authority for the Debtor to utilize cash and proceeds of accounts and inventory subject to liens of the Pre-Petition Lenders.

On November 6, 2009, the Bankruptcy Court entered an interim order approving the Cash Collateral Motion (Docket No. 51). On December 1, 2009, the Bankruptcy Court entered a second interim order approving the Cash Collateral Motion (Docket No. 137). On January 28, 2010, the Bankruptcy Court entered an order permitting the Debtor to continue to use cash collateral pursuant to the second interim order approving the Cash Collateral Motion and scheduling a final hearing on Cash Collateral Motion for February 16, 2010 (Docket No. 307). On February 16, 2010, the Bankruptcy Court entered the Final Agreed Order Authorizing Max &

Erma's Restaurants, Inc.'s Limited Use of Cash Collateral and Granting Adequate Protection to Existing Lienholders (the "Cash Collateral Order") (Docket No. 389). Pursuant to the Cash Collateral Motion and the Cash Collateral Order, the Pre-Petition Lenders were granted, among other forms of adequate protection, replacement liens, payment of professional fees and other consideration.

The Cash Collateral Order also provided the Committee and other parties in interest with a period of time to investigate, and, if necessary, to challenge the amount and extent of the Pre-Petition Lenders' Claims as well as the validity of their Liens (the "Investigatory Period").

On April 2, 2010, the Debtor, the Committee and the Pre-Petition Lenders filed a proposed stipulated order supplementing the Cash Collateral Order in order to extend the Investigatory Period and limit the right to challenge the Pre-Petition Lenders' Claims and Liens to the Committee alone; the proposed stipulated order was entered by the Bankruptcy Court on April 6, 2010 (Docket No. 479). On June 8, 2010, the Bankruptcy Court entered the Revised Order Approving Second Stipulated Order Supplementing the Cash Collateral Order (Docket No. 735), which further extended the Investigatory Period to the earlier of (a) June 15, 2010 or (b) five (5) business days after the Committee's receipt of a notice of default under the Cash Collateral Order. Since that time, the Pre-Petition Lenders and the Committee have consensually extended the Investigatory Period.

The Committee alleges that the Liens of the Pre-Petition Lenders are Disputed and that as a result of this dispute, the Pre-Petition Bank Debt is not fully secured, among other things. In particular, the Committee alleges that the Pre-Petition Lenders are not properly perfected in a credit card receipt account, certain buildings owned by the Debtor and fixtures owned by the Debtor, among other items. The Pre-Petition Lenders, through PNC Bank, as Agent, dispute the Committee's allegations.

(c)     <u>Appointment of the Official Committee of Unsecured Creditors</u>

On November 20, 2009, the Office of the United States Trustee filed its Notice of Appointment of Committee of Unsecured Creditors and appointed seven (7) members to serve on a committee and to represent the interests of all general unsecured creditors of Max & Erma's. The seven (7) members are: (i) Friedberg Milstein Private Capital Fund I; (ii) The Coca-Cola Company; (iii) Matrix Media Services, Inc.; (iv) Monroe Mechanical, Inc.; (v) Facilitec USA, Inc.; (vi) McQ Clean, LLC; and (vii) Cornerstone Max Pickerington, LLC. William Kaye of JLL Consultants, Inc. and Robert Zable (subsequently replaced by James Roche) of GSO/Blackstone Debt Funds Management, LLC serve as the co-chairmen of the Committee. The Bankruptcy Court approved the retention of McGuireWoods LLP as bankruptcy counsel to the Committee (Docket No. 248) and Walker Nell Partners, Inc. as financial advisors to the Committee (Docket No. 238).

(d)     <u>The Trustee Motion and the Appointment of Mark A. Roberts as Chief Restructuring Officer</u>

On December 28, 2009, the Committee and the Pre-Petition Lenders filed a Joint Motion for the Appointment of a Chapter 11 Trustee or in the Alternative Termination of the Exclusive Period to File a Chapter 11 Plan (the "Trustee Motion") (Docket No. 209). Subsequent to the

filing of the Trustee Motion, the Committee, the Pre-Petition Lenders and the Debtor submitted to the Bankruptcy Court a proposed Stipulation and Consent Order Authorizing and Directing the Debtor to Retain a Chief Restructuring Officer, which was entered by the Bankruptcy Court on January 15, 2010 (Docket No. 272, the "CRO Order").  The CRO Order effectively resolved the Trustee Motion.  Pursuant to the CRO Order, Mark A. Roberts of the firm of Alvarez & Marsal North America LLC was retained to act as chief restructuring officer of Max & Erma's.

An Expedited Application to Employ Alvarez & Marsal North America LLC as Crisis Managers for the Debtor and to Appoint Mark A. Roberts as Chief Executive Officer was also filed by the Debtor on January 20, 2010 (Docket No. 289, "A&M Application") and subsequently granted by the Bankruptcy Court on February 18, 2010 (Docket No. 378).  The A&M Application made clarifications to the CRO Order (including, without limitation, appointing Mark A. Roberts as the chief executive officer) as well as provided additional disclosures relating to the disinterestedness of Mark A. Roberts and A&M.

Mark A. Roberts has since been managing the daily operations of the Debtor as both its chief restructuring officer and the chief executive officer.

### (e)     Claims Bar Dates

The Bankruptcy Court established March 30, 2010 as the final date for creditors (other than governmental entities) to file proofs of claims against the Debtor.  The final date for governmental entities to file proofs of claims against the Debtor was April 21, 2010 (collectively, the "Bar Dates").  Pursuant to Bankruptcy Rule 3003(c)(2), any creditor: (a) whose Claim (i) was not scheduled by the Debtor or (ii) was scheduled as disputed, contingent or unliquidated, and (b) who failed to file a proof of claim on or before the applicable Bar Date, will not be treated as a Creditor with respect to that Claim for purposes of voting on the Plan or receiving a distribution under the Plan.  Counsel to the Debtor served notice of the Bar Dates on all known creditors on December 11, 2009.

A deadline for filing Administrative Claims has not been established as of the date of this Disclosure Statement.  The Debtor has requested (through the Plan) that the Bankruptcy Court establish the date that is 45 days after the entry of the Post-Confirmation Order and Notice as the Administrative Claim Bar Date.

### (f)     Schedules and Statement of Financial Affairs

On December 1, 2009 the Debtor filed its Schedules of Assets and Liabilities and Statement of Financial Affairs (Docket No. 164).  The Schedules of Assets and Liabilities and Statement of Financial Affairs were subsequently amended on December 9, 2009.

### (g)     Extensions of Exclusivity

Section 1121(b) of the Bankruptcy Code provides that, until 120 days after the order for relief, a debtor has the exclusive right to file a plan of reorganization (the "Exclusive Filing Period").  Additionally, section 1121(c)(3) of the Bankruptcy Code provides that exclusivity is extended for an additional 60 days (for a total of 180 days) to solicit acceptances of such plan (the "Exclusive Solicitation Period") if the debtor files a plan during the Exclusive Filing Period.

On March 3, 2010, the Bankruptcy Court entered an order extending the Debtor's Exclusive Filing Period through and including June 20, 2010, and the Debtor's Exclusive Solicitation Period through and including August 19, 2010 (Docket No. 416). Additionally, the Bankruptcy Court entered an Order extending the Debtor's Exclusive Filing Period through and including July 20, 2010 (Docket No. 743).

(h)     Assumption or Rejection of Certain Executory Contracts and Unexpired Leases

The Debtor has filed, and the Bankruptcy Court has approved, four separate Motions to Reject Unexpired Leases of Nonresidential Real Property (Docket Nos. 208, 296, 306 and 327). These motions served to divest the Debtor of unprofitable stores.

The Debtor filed a Revised Motion for Entry of an Order Extending the Time to Assume or Reject Unexpired Leases of Nonresidential Real Property seeking to extend the deadline by which it must assume or reject non-residential leases of real property through May 21, 2010 (Docket No. 334). Such motion was granted by the Bankruptcy Court pursuant to an order dated March 10, 2010 (Docket No. 433).

Since the entry of such order, the Debtor has filed approximately 41 stipulations with various landlords, agreeing to extend the deadline by which it must assume or reject non-residential leases of real property through August 31, 2010. All such stipulations have been approved by the Bankruptcy Court[1].

(i)     Marketing of the Debtor and Its Assets

William Blair is the Debtor's investment banker. Since being engaged, William Blair worked with the Debtor and A&M to assemble a comprehensive electronic data room for interested parties. William Blair contacted approximately 180 potential financial buyers and 49 potential strategic advisors regarding the Max & Erma's opportunity. Approximately 58 of the parties contacted by William Blair executed confidentiality agreements and received the offering memorandum prepared by William Blair. As a result of the process undertaken by William Blair, seven letters of intent were received by the Debtor from interested parties – four from proposed financial buyers and three from proposed strategic purchasers. The Debtor, its representatives and the Committee, actively negotiated letters of intent with three alternative potential purchasers. Essentially, an out of court auction was conducted by the Debtor and the Committee with these three parties. At the conclusion of the negotiation process, the Debtor and Committee determined that the offer from the Purchaser (Concept Development Partners LLC) was in the best interest of the Debtor, its estate and creditors. As a result of this determination, on May 10, 2010, the Debtor and Committee executed a letter of intent with the Purchaser and began negotiating definitive documentation which has resulted in the Plan, Agreement and Sale Documents pending before the Court for approval. The May 10, 2010 letter of intent by and among the Debtor, the Committee and the Purchaser was revised by letter agreement dated June 10, 2010 and ultimately superceded by the Agreement dated as of July 2, 2010.

---

[1]  See Docket Nos. 528, 529, 530, 531, 532, 533, 534, 535, 536, 537, 538, 539, 565, 566, 567, 568, 569, 570, 582, 604, 605, 606, 610, 625, 626, 627, 629, 630, 647, 650, 651, 652, 679, 680, 681, 682, 684, 685, 686, 687 and 688.

### 3.3 Compliance with the Bankruptcy Code, Bankruptcy Rules, Local Rules and United States Trustee Guidelines

On January 20, 2010, the United States Trustee conducted a meeting of creditors pursuant to section 341 of the Bankruptcy Code. An authorized representative of the Debtor attended the meeting. Additionally, the Debtor has filed all monthly operating reports and timely paid all statutory quarterly fees as required by the Office of the United States Trustee. To the best of the Debtor's knowledge, and upon information and belief, the Debtor has complied with all other applicable requirements of the Bankruptcy Code and Bankruptcy Rules, as well as any local rules of the Bankruptcy Court and deadlines of the United States Trustee.

## ARTICLE IV - SUMMARY AND OVERVIEW OF THE PLAN

### 4.1 Summary

If the Plan is confirmed, the Purchaser, Concept Development Partners, LLC, which will be owned and controlled by CIC II LP and CDP Management Partners, LLC, will acquire substantially all of the Debtor's assets and manage and a substantial majority of currently operating company-owned stores. The Sale consideration includes the following: (a) Purchaser's Cash payment of approximately $14.75 million, including credit for the Deposit (subject to potential adjustment for the Working Capital Adjustment Amount and/or Allowed Cure Claims relating to Acquired Contracts; (b) Purchaser's assumption and payment of Allowed Cure Claims relating to Unexpired Leases up to the amounts identified on Schedule 2.3 to the Agreement (as may be modified) and up to $90,000 relating to Executory Contracts that are Acquired Contracts; (c) Purchaser's assumption of Gift Card Claims no more than $2.5 million; (d) Purchaser's assumption and installment payment of Allowed Priority Tax Claims not otherwise provided for in the Plan and Allowed Secured Personal Property Tax Claims relating to Acquired Assets, which shall not exceed $2,507,926 in the aggregate plus statutory post-Effective Date interest; (e) Purchaser's issuance of the M&E Trust Note to the M&E Trust in the original principal amount of $2.5 million (subject, however, to potential adjustment for the Working Capital Adjustment Amount and/or Cure Claims relating to Acquired Contracts that exceed limits as Assumed Liabilities); and (f) Purchaser's assumption and payment in the ordinary course of Allowed Administrative Expense Claims excluding Retained Administrative Expense Claims. The source of payment for the M&E Trust Note will be the operating revenues of Max & Erma's restaurants owned and operated by the Purchaser.

The Plan provides for payment in full of all Allowed Claims other than Allowed Class 1 Claims (potentially), Allowed Class 5 Claims and Claims of Insiders. The holders of subordinated General Unsecured Claims and the holders of Equity Interests will not receive any distributions under the Plan. All Equity Interests will be cancelled without further action by the Debtor on the termination date of the Transition Agreement. The Claims of Insiders are Disputed Claims.

The Reinert Entities and Gary Reinert, Sr. have collectively asserted five (5) Claims against the Debtor. Each of these Claims is an Insider Claim and is disputed by the Committee. These Claims and the general bases for dispute (which bases are exemplary only, not all inclusive, and all rights are reserved to assert other bases for objection and disallowance) by the Committee are as follows:

(i) Claim No. 231 of Road Runner Planning filed on 03-31-10 in the unsecured amount of $871,549.37 is disputed because (a) the Debtor's books and records do not reflect an amount due to this entity; (b) the Claim was filed after the Claims Bar Date; (c) the Claim is subject to equitable subordination arguments; and/or (d) subject to Bankruptcy Code section 502(d) disallowance;

(ii) Claim No. 232 of Power Contracting, Inc. filed on 03-31-10 in the unsecured amount of $431,378.64 is disputed because (a) the Debtor's books and records do not reflect an amount due to this entity; (b) the Claim was filed after the Claims Bar Date; (c) the Claim is subject to equitable subordination arguments; and/or (d) subject to Bankruptcy Code section 502(d) disallowance;

(iii) Claim No. 233 of G&R Acquisitions filed on 03-31-10 in the unsecured amount of $8,672,813 is disputed because (a) the Debtor's books and records do not reflect an amount due to this entity; (b) the Claim was filed after the Claims Bar Date; (c) the Claim is actually an Interest and not a Claim; (d) the Claim is subject to equitable subordination arguments; and/or (e) subject to Bankruptcy Code section 502(d) disallowance;

(iv) Claim No. 234 of Gary Reinert, Sr. filed on 03-31-10 in the unsecured amount of $1,685,000 is disputed because (a) the Claim was filed after the Claims Bar Date; (b) subject to equitable subordination arguments; and/or (c) subject to Bankruptcy Code section 502(d) disallowance; and

(v) Claim No. 179 of Damon's International, Inc. filed on 03-24-10 filed in a contingent and unliquidated unsecured amount is disputed because (a) the Debtor's books and records do not reflect an amount due to this entity; (b) subject to setoff or recoupment for amounts due and owing by Damon's International, Inc. to the Debtor; and (c) subject to Bankruptcy Code section 502(d) disallowance.

The Committee likewise reserves all rights to challenge the validity of Claims of Insiders scheduled by the Debtor, as such Claims are disputed by the Committee.

The Plan Proponents submit that the Plan, accompanying Agreement and Sale Documents, provide the best option for the holders of Allowed Claims to maximize their recoveries.

The following table provides a summary of the classification and treatment under the Plan of Claims and Equity Interests. The summary is qualified in its entirety by the more detailed information in the Plan and this Disclosure Statement. The total amount of the Claims reflects the Plan Proponents' current estimate, based upon the Debtor's Schedules, books and records; the Proofs of Claim filed on the Claims Register; and the informed opinion of the Plan Proponents' professionals of the likely amount of certain objectionable claims after resolution by settlement or litigation. Reference should be made to the entire Disclosure Statement and to the Plan for a complete description of the classification and treatment of Claims and Equity Interests.

| Unclassified | Unimpaired |
|---|---|
| **Administrative Expense Claims** | Other than Retained Administrative Expense Claims and except to the extent that a holder of an Allowed Administrative Expense Claim agrees to a different treatment or as otherwise expressly provided for in the Plan, the Purchaser will on the Effective Date assume all current and not more than seven (7) days past due (of which the Debtor submits there are none) Administrative Expense Claims and pay each holder of an Allowed Administrative Expense Claim in Cash in the ordinary course as and when they become due. Unless otherwise agreed to by the holder of an Allowed Administrative Claim and the Debtor or Purchaser, as applicable, each holder of an Allowed Administrative Claim (other than of a Professional Claim) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim either: (a) in the ordinary course following the Effective Date, or (b) if the Administrative Claim is not Allowed as of the Effective Date, within thirty (30) days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter. The M&E Trust will pay Retained Administrative Expense Claims as soon as practicable after the Effective Date once such Claims are Allowed. |
| Total Estimated Allowed Claims | not more than $2.5 million |
| Recovery % | 100% |
| **Administrative Claims arising under 11 U.S.C. § 503(b)(9)** | The holders of Allowed Section 503(b)(9) Claims will be paid in full by the M&E Trustee in Cash within twenty (20) days after the date on which an order Allowing any Section 503(b)(9) Claim becomes a Final Order, or as soon as reasonably practicable thereafter. Section 503(b)(9) Claims are not Administrative Expense Claims to be assumed by the Purchaser on the Effective Date. Section 503(b)(9) Claims are Retained Administrative Expense Claims. |
| Total Estimated Allowed Claims | $0.00 |
| Recovery % | n/a, but 100% if any such Claim is Allowed |

| Compensation and Reimbursement Claims | All Professionals or other Persons seeking Bankruptcy Court approval of Professional Compensation incurred through and including the Effective Date (i) must file, where applicable, their respective final applications for allowance of Professional Compensation within thirty days following the Effective Date; and (ii) Allowed Professional Claims be paid in full by the M&E Trustee on the date when the order relating to any such Administrative Expense Claim is a Final Order, or on such other terms as may be mutually agreed upon between the holder of such an Administrative Expense Claim and the M&E Trustee. Professional Claims for Professional Compensation are not Administrative Expense Claims to be assumed by Purchaser on the Effective Date. Allowed Claims for Professional Compensation are Retained Administrative Expense Claims. Professional Compensation Claims include Lender Professional Claims which are to be reviewed by the M&E Trustee and paid in the ordinary course. |
|---|---|
| Total Estimated Allowed Claims | not to exceed $2.0 million |
| Recovery % | 100% |
| **Priority Tax Claims** | Allowed Priority Tax Claims will be paid in full in Cash, including statutory interest after the Effective Date from the Purchaser in equal monthly installments commencing in the first full month following the Effective Date such that Allowed Priority Tax Claims will be paid in sixty (60) months from the Effective Date. The Purchaser may, in its sole discretion, at any time, pre-pay Allowed Priority Tax Claims. In the event of objection by a holder of a Priority Tax Claim to the treatment of Allowed Priority Tax Claims under section 2.4 of the Plan, Purchaser and the applicable objecting holder of a Priority Tax Claim will reach agreement on acceptable treatment of such Priority Tax Claim prior to the Effective Date. Notwithstanding the foregoing, the ability of Purchaser to reach an agreement on payment terms with holders of Allowed Priority Tax Claims shall be a condition precedent to the Effective Date. The deferred payment of Priority Tax Claims shall not serve as a basis for the prohibition of transfers of Liquor Licenses from Debtor to Purchaser. |
| Total Estimated Allowed Claims | Not to exceed $2,507,926 |

| | |
|---|---|
| Recovery % | 100% |
| **U. S. Trustee Fees** | All fees payable in the Case under 28 U.S.C. § 1930, as agreed by the Debtor or as determined by the Bankruptcy Court, will, if not previously paid, be paid in full in Cash on the Effective Date and will continue to be paid by the M&E Trust as required under 28 U.S.C. § 1930 until such time as an order is entered by the Bankruptcy Court closing the Case. |
| Total Estimated Allowed Claims (as of Effective Date) | $10,000 (approximate) |
| Recovery % | 100% |

| **Class 1** | **Impaired** |
|---|---|
| **Secured Lender Claims**<br><br><br><br><br><br><br><br><br><br><br>Total Estimated Allowed Claims<br><br>Recovery % | Class 1 consists of Claims of the holders of Pre-Petition Bank Debt. On the Effective Date, the Agent will be paid the Initial Pre-Petition Lender Payment as soon as practical. At the time of the first distribution by the M&E Trust to Beneficiaries, PNC Bank, in its capacity as Agent, will be paid at least the Initial M&E Trust Pre-Petition Lender Payment as soon as practical. To the extent that the Final Adjustment Statement, as such term is defined in section 3.3.d of the Agreement, reflects an overpayment by the Purchaser at closing, thus requiring the payment of an adjustment amount by the M&E Trust to Purchaser, the adjustment amount will be funded by the M&E Trust in the following order of priority: the first $3,075,000 disbursed will reduce the general cash fund of the M&E Trust. If the adjustment exceeds $3,075,000, then an additional sum equal to the lesser of $950,000 or the difference between $950,000 and the amount approved by the Bankruptcy Court for payment to Professionals for services provided prior to the Effective Date, will be disbursed to the Purchaser from a separate account which will hold $950,000 for the benefit of the Agent ("Agent Account"). As soon as practical after payment of the amount that the M&E Trust is required to pay pursuant to the Final Adjustment Statement, if any, the funds held in the Agent Account will be distributed. If funds in the M&E Trust general account are not sufficient to pay approved Professional fees incurred prior to the Effective Date, such amounts due may be paid from Agent Account. Any funds remaining in the |

| | |
|---|---|
| | Agent Account after payment of the Approved professional fees incurred prior to the Effective Date will be paid to the Agent. With respect to all other distributions to Beneficiaries by the M&E Trust, until such time as the Pre-Petition Bank Debt is paid in full, PNC Bank, in its capacity as Agent, will be paid Subsequent M&E Trust Pre-Petition Lender Payments. All contractual rights of subordination, guarantees and judgments granted to the Agent will remain in effect and not be altered or impaired in any manner by this Plan before or after the Effective Date. Judgments of the Agent against Persons (including, without limitation, Insiders), to the extent collected, will be immediately applied by Agent to the outstanding balance of the Pre-Petition Bank Debt, after payment of fees and costs associated with collection of the judgments.<br><br>$16.282 million<br><br>up to 100% |

| Class 2 | Impaired |
|---|---|
| **Secured Personal Property Tax Claims** | Except to the extent that a holder of an Allowed Class 2 Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of Allowed Class 2 Claims, such Claim will, at Purchaser's election, either:<br><br>(a)  be paid Cash by Purchaser on the Effective Date in an amount equal to such Allowed Class 2 Claim; or<br><br>(b)  be assumed by Purchaser and for a period not exceeding sixty (60) months from the Effective Date, paid equal quarterly Cash payments commencing in the first full month following the Effective Date, that in the aggregate are equal to the Allowed Class 2 Claims, together with interest at the applicable statutory rate (with no accruing penalty), which at the sole discretion of the Purchaser may be prepaid.<br><br>Each holder of an Allowed Class 2 Claim shall retain its lien until its respective Allowed Class 2 Claim is paid in full. |

| Total Estimated Allowed Claims | Approximately $153,000 |
| Recovery % | 100% |

| **Class 3** | **Unimpaired** |
|---|---|
| **Other Secured Claims** | Except to the extent that a holder of an Allowed Class 3 Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of Allowed Class 3 Claims, holders of Allowed Class 3 Claims will receive from the Purchaser either:<br><br>(a)  payment pursuant to contract terms;<br><br>(b)  Cash on the Effective Date in an amount equal to such Allowed Class 3 Claims required to be paid pursuant to section 506(b) of the Bankruptcy Code; or<br><br>(c)  the Collateral of the holder of such Allowed Class 3 Claim within ten (10) days following the Effective Date, in which case the holder of such Allowed Class 3 Claim will have thirty (30) days from the date of surrender of such Collateral to file a General Unsecured Claim representing any deficiency. |
| Total Estimated Allowed Claims | $0.00 |
| Recovery % | n/a, but 100% if any such Claim is Allowed |

| **Class 4** | **Unimpaired** |
|---|---|
| **Priority Gift Card Claims** | On the Effective Date, Purchaser will assume all Gift Card Claims and Gift Card Claims will be honored by Max & Erma's after the Effective Date according to standard terms and conditions in the ordinary course of business on presentment/redemption of valid gift cards/gift certificates at Max & Erma's restaurants that are Purchased Stores. |
| Total Estimated Allowed Claims | not to exceed $2.5 million |
| Recovery % | 100% |

| Class 5 | Impaired |
| --- | --- |
| **General Unsecured Claims** | The holders of Allowed Class 5 Claims will receive from the M&E Trustee a *Pro Rata* share of the Initial M&E Trust Unsecured Payment and Subsequent M&E Trust Unsecured Payments. Distributions to the holders of Allowed Class 5 Claims will be made at the discretion of the M&E Trustee in accordance with the M&E Trust Agreement. |
| Total Estimated Allowed Claims | Approximately $24 million excluding Pre-Petition Lenders Claim or approximately $28,282 million with Pre-Petition Lenders' Claim |
| Recovery % | est. 10% to 20% |

| Class 6 | Impaired |
| --- | --- |
| **Subordinated Unsecured Claims** | The holders of Allowed Class 6 Claims will not receive a distribution on account of their Claims |
| Total Estimated Claims | $400,000 |
| Recovery % | 0% |

| Class 7 | Impaired |
| --- | --- |
| **Equity Interests** | The holders of Allowed Class 7 Interests will not receive a distribution on account of their Interests. |
| Total Estimated Allowed Claims | N/A |
| Recovery % | 0% |

### 4.2 Classification and Treatment of Allowed Claims and Equity Interests

(a) Unclassified Allowed Claims

The Bankruptcy Code does not require administrative and certain priority claims to be classified under a chapter 11 plan. Accordingly, Administrative Expense Claims, Priority Tax Claims, Professional Fee Claims, and statutory fees payable to the United States Trustee have not been classified in the Plan. The Plan proposes to treat such Claims as follows:

(i) Administrative Expense Claims

Other than Retained Administrative Expense Claims and Cure Claims and except to the extent that a holder of an Allowed Administrative Expense Claim agrees to a different treatment or as otherwise expressly provided for in the Plan, the Purchaser will on the Effective Date assume all current and not materially past due (of which the Debtor submits there are none) Administrative Expense Claims and pay each holder of an Allowed Administrative Expense Claim in Cash in the ordinary course as and when they become due. Unless otherwise agreed to by the holder of an Allowed Administrative Claim and the Debtor or Purchaser, as applicable, each holder of an Allowed Administrative Claim (other than of a Professional Claim) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim either: (a) in the ordinary course following the Effective Date, or (b) if the Administrative Claim is not Allowed as of the Effective Date, within thirty (30) days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter. The M&E Trust will pay Retained Administrative Expense Claims as soon as practicable after the Effective Date once such Claims are Allowed.

(A) **Administrative Expense Claim Bar Date**. All requests for allowance and payment of Administrative Expense Claims other than Cure Claims, but including Claims asserted pursuant to section 503(b)(9) of the Bankruptcy Code ("Section 503(b)(9) Claims"), must be filed with the Bankruptcy Court and served in accordance with the Bankruptcy Rules within forty-five (45) days after entry of the Post-Confirmation Order and Notice. Administrative Expense Claims that are not timely filed will be disallowed automatically and deemed forever barred, estopped, and enjoined from assertion, and without the need for any objection by the Purchaser or the M&E Trustee or any further notice to or action, order, or approval of the Bankruptcy Court, and are not enforceable against the Purchaser or the M&E Trust, as the case may be.

(ii) <u>Compensation and Reimbursement Claims</u>

All Professionals or other Persons seeking Bankruptcy Court approval of Professional Compensation incurred through and including the Effective Date, other than Lender Professionals, must file, where applicable, their respective final applications for allowance of Professional Compensation within thirty (30) days following the Effective Date; and Allowed Professional Claims be paid in full by the M&E Trustee on the date when the order relating to any such Administrative Expense Claim is a Final Order, or on such other terms as may be mutually agreed upon between the holder of such an Administrative Expense Claim and the M&E Trustee. Lender Professional Claims are to be submitted to the M&E Trust for consideration and payment. Professional Claims for Professional Compensation are not Administrative Expense Claims to be assumed by Purchaser on the Effective Date. Allowed Claims for Professional Compensation are Retained Administrative Expense Claims.

(iii) <u>Priority Tax Claims</u>

Allowed Priority Tax Claims will be paid in full in Cash, including statutory interest from the Purchaser in equal monthly installments commencing in the first full month following the Effective Date such that Allowed Priority Tax Claims will be paid in sixty (60) months from the

Effective Date. The Purchaser may, in its sole discretion, at any time, pre-pay Allowed Priority Tax Claims. In the event of objection by a holder of a Priority Tax Claim to the treatment of Allowed Priority Tax Claims under section 2.4 of the Plan, Purchaser and the applicable objecting holder of a Priority Tax Claim will reach agreement on acceptable treatment of such Priority Tax Claim prior to the Effective Date. Notwithstanding the foregoing, the ability of Purchaser to reach and agreement on payment terms with holders of Allowed Priority Tax Claims shall be a condition precedent to the Effective Date. The deferred payment of Priority Tax Claims shall not serve as a basis for the prohibition of transfers of Liquor Licenses from Debtor to Purchaser.

(iv)   <u>Statutory Fees Pursuant to 28 U.S.C. §1930</u>

All fees payable in the Case under 28 U.S.C. § 1930, as agreed by the Debtor or as determined by the Bankruptcy Court, will, if not previously paid, be paid in full in Cash on the Effective Date and will continue to be paid by the M&E Trust as required under 28 U.S.C. § 1930 until such time as an order is entered by the Bankruptcy Court closing the Case. Fees referred to in this section are Retained Administrative Expense Claims except to the extent that Purchaser is required to make contributions pursuant to the Transition Agreement.

(b)   <u>Classification and Treatment of Allowed Claims and Equity Interests</u>

A Claim or Equity Interest is placed in a particular Class only to the extent that the Claim or Equity Interest falls within the description of that Class, and is placed in other Classes to the extent that any portion of the Claim or Equity Interest falls within the description of such other Classes. A Claim is also placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released or otherwise settled prior to the Effective Date. The Plan classifies Claims and Equity Interests as follows:

(i)   <u>Class 1: Secured Lender Claims</u>

*Impairment and Voting.* Class 1 is Impaired under the Plan and each holder of a Class 1 Claim is entitled to vote to accept or reject the Plan.

*Treatment.* Class 1 consists of Claims of the holders of Pre-Petition Bank Debt. On the Effective Date, the Agent will be paid the Initial Pre-Petition Lender Payment as soon as practical. At the time of the first distribution by the M&E Trust to Beneficiaries, PNC Bank, in its capacity as Agent, will be paid at least the Initial M&E Trust Pre-Petition Lender Payment as soon as practical. To the extent that the Final Adjustment Statement, as such term is defined in section 3.3.d of the Agreement, reflects an overpayment by the Purchaser at closing, thus requiring the payment of an adjustment amount by the M&E Trust to Purchaser, the adjustment amount will be funded by the M&E Trust in the following order of priority: the first $3,075,000 disbursed will reduce the general cash fund of the M&E Trust. If the adjustment exceeds $3,075,000, then an additional sum equal to the lesser of $950,000 or the difference between $950,000 and the amount approved by the Bankruptcy Court for payment to Professionals for services provided prior to the Effective Date, will be disbursed to the Purchaser from the Agent Account which will hold $950,000 for the benefit of the Agent. As soon as practical after payment of the amount that the M&E Trust is required to pay pursuant to the Final Adjustment

Statement, if any, the funds held in the Agent Account will be distributed. If funds in the M&E Trust general account are not sufficient to pay approved Professional fees incurred prior to the Effective Date, such amounts due may be paid from Agent Account. Any funds remaining in the Agent Account after payment of the Approved professional fees incurred prior to the Effective Date will be paid to the Agent. With respect to all other distributions to Beneficiaries by the M&E Trust, until such time as the Pre-Petition Bank Debt is paid in full, PNC Bank, in its capacity as Agent, will be paid Subsequent M&E Trust Pre-Petition Lender Payments. All contractual rights of subordination, guarantees and judgments granted to the Agent will remain in effect and not be altered or impaired in any manner by this Plan before or after the Effective Date. Judgments of the Agent against Persons (including, without limitation, Insiders), to the extent collected, will be immediately applied by Agent to the outstanding balance of the Pre-Petition Bank Debt, after payment of fees and costs associated with collection of the judgments.

(ii)    <u>Class 2:  Secured Personal Property Tax Claims</u>

*Impairment and Voting.*  Class 2 is Impaired under the Plan and each holder of a Class 2 Claim is entitled to vote to accept or reject the Plan.

*Treatment.* Except to the extent that a holder of an Allowed Class 2 Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of Allowed Class 2 Claims, such Claim will either:

(a)    be paid Cash by Purchaser on the Effective Date in an amount equal to such Allowed Class 2 Claim; or

(b)    be assumed by Purchaser and for a period not exceeding sixty (60) months from the Effective Date, paid equal quarterly Cash payments commencing in the first full month following the Effective Date, that in the aggregate are equal to the Allowed Class 2 Claims, together with interest at the applicable statutory rate (with no accruing penalty), which at the sole discretion of the Purchaser may be prepaid.

Each holder of an Allowed Class 2 Claim shall retain its lien until its respective Allowed Class 2 Claim is paid in full.

(iii)    <u>Class 3: Other Secured Claims</u>

*Impairment and Voting.* Class 3 is not Impaired under the Plan.  Holders of Class 3 Claims are not entitled to vote to accept or reject the Plan.  Pursuant to section 1126(f) of the Bankruptcy Code, Class 3 is deemed to have accepted the Plan.

*Treatment.*  Except to the extent that a holder of an Allowed Class 3 Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of Allowed Class 3 Claims, holders of Allowed Class 3 Claims will receive from the Purchaser either:

(a)    payment pursuant to contract terms; or

(b)    Cash on the Effective Date in an amount equal to such Allowed Class 3 Claims required to be paid pursuant to section 506(b) of the Bankruptcy Code; or

(c)    the Collateral of the holder of such Allowed Class 3 Claim within ten (10) days following the Effective Date, in which case the holder of such Allowed Class 3 Claim will have thirty (30) days from the date of surrender of such Collateral to file a General Unsecured Claim representing any deficiency.

(iv)    <u>Class 4: Priority Gift Card Claims</u>

*Impairment and Voting.* Class 4 is not Impaired under the Plan. Holders of Class 4 Claims are not entitled to vote to accept or reject the Plan. Pursuant to section 1126(f) of the Bankruptcy Code, Class 4 is deemed to have accepted the Plan.

*Treatment.* On the Effective Date, Purchaser will assume all Gift Card Claims and Gift Card Claims will be honored by Purchaser after the Effective Date according to standard terms and conditions in the ordinary course of business on presentment/redemption of valid gift cards/gift certificates at Max & Erma's restaurants that are Purchased Stores.

(v)    <u>Class 5: General Unsecured Claims</u>

*Impairment and Voting.* Class 5 is Impaired under the Plan and each holder of a Class 5 Claim is entitled to vote to accept or reject the Plan

*Treatment.* The holders of Allowed Class 5 Claims will receive from the M&E Trustee a *Pro Rata* share of the Initial M&E Trust Unsecured Payment and Subsequent M&E Trust Unsecured Payments. Distributions to the holders of Allowed Class 5 Claims will be made at the discretion of the M&E Trustee in accordance with the M&E Trust Agreement.

(vi)    <u>Class 6: Subordinated Unsecured Claims</u>

*Impairment and Voting.* Class 6 is Impaired under the Plan. Because the holders of Allowed Class 6 Claims will not receive a distribution on account of their Claims, the holders of Allowed Class 6 Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Holders of Allowed Class 6 Claims are not entitled to vote to accept or reject the Plan. If, however, holders of Allowed Class 6 Claims vote to accept treatment as outlined in this Plan, that Ballot shall be counted in the vote tabulation.

*Treatment.* Class 6 consists of (i) contractually subordinated Claims of Gary L. Reinert, Sr., the Reinert Entities and/or any Insider that paid funds to Alvarez & Marsal North America, LLC and/or William Blair & Company in conjunction with their respective retentions in this Case, and (ii) Claims subordinated pursuant to Final Order. The holders of Allowed Class 6 Claims will not receive any distributions on account of such Claims.

(vii)    <u>Class 7: Equity Interests</u>

*Impairment and Voting.* Class 7 is Impaired under the Plan. Because the holders of Allowed Class 7 Interests will not receive a distribution on account of their Interests, the holders of Allowed Class 7 Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Holders of Allowed Class 7 Interests are not entitled to vote to accept or reject the Plan.

*Treatment.*  On the termination date of the Transition Agreement, Allowed Class 7 Interests will be deemed automatically cancelled without further action by the Debtor.  The holders of Class 7 Interests will receive no distribution under the Plan.  The Confirmation Order will enjoin the holders of Class 7 Interests from taking any action that may in any way interfere with or impede the provisions of the Transition Agreement.  William Neigsch will be appointed on the Effective Date to take all actions required of the Debtor under the Transition Agreement.

## ARTICLE V - MEANS OF IMPLEMENTATION OF THE PLAN

### 5.1    Source of Consideration for Plan Distributions.

(a)    <u>Distribution Sources</u>.  Distributions under the Plan will be funded from two sources: the Purchaser with respect to Cash consideration under the Agreement, Assumed Liabilities and the M&E Trust with respect to M&E Trust Assets.

(b)    <u>The Sale</u>.  On the Effective Date, pursuant to the Agreement which will be deemed approved by the Bankruptcy Court on entry of the Confirmation Order, the Purchaser will acquire the Acquired Assets, which include all of the Debtor's assets other than the Excluded Assets.  A significant component of Purchaser's consideration for the Sale is the assumption by Purchaser and payment of certain Allowed Claims as follows:

(i)    Priority Tax Claims and Allowed Class 2 Claims relating to Acquired Assets in an amount not to exceed $2,507,926 plus post-Effective Date interest;

(ii)    Allowed Class 3 Claims;

(iii)    Allowed Class 4 Claims;

(iv)    Allowed Cure Claims up to amount identified in Schedule 2.3 to the Agreement with respect to Unexpired Leases and up to $90,000 with respect to Executory Contracts, each with respect to Purchased Stores; and

(v)    Allowed Administrative Expense Claims other than Retained Administrative Expense Claims.

As additional consideration for the Acquired Assets under the Agreement, on the Effective Date, Purchaser will (i) pay $14.75 million, subject to adjustment for any Working Capital Adjustment Amount and Cure Claims as set forth above; and (iii) issue the M&E Trust Note.

(c)    <u>The Cash Consideration</u>.  At the time of Closing on the Effective Date, the $14.75 million of Cash consideration, subject to adjustment, will be disbursed as follows:

(i)    $12.0 million to PNC Bank, as Agent, in accordance with Section 4.1 of the Plan; and

(ii)     The balance totaling Two Million Seven Hundred Fifty Thousand Dollars ($2,750,000), subject to adjustment, will be paid to the M&E Trust for distribution in accordance with the M&E Trust Agreement and the Plan.

(d)     <u>The M&E Trust Note</u>.  The M&E Trust Note will be issued by the Purchaser, as maker, to the M&E Trust, as payee and holder, for the benefit of holders of Allowed General Unsecured Claims who are the Beneficiaries of the M&E Trust.

**5.2     The M&E Trust**

(a)     <u>Creation of the M&E Trust</u>.  On the Effective Date, the M&E Trust will be formed.  The M&E Trust Agreement, in substantially the same form as included in the Plan Supplement at Exhibit A, will be approved by the Bankruptcy Court pursuant to the Confirmation Order and executed by the M&E Trustee, and all other necessary steps shall be authorized by the Bankruptcy Court and taken to establish the M&E Trust.

(i)     <u>Purpose of M&E Trust</u>.  The M&E Trust will be established and maintained, in accordance with Treasury Regulation section 301.7701-4(d), for the purpose of collecting, holding, liquidating, monetizing and distributing the M&E Trust Assets, resolving and administering Claims, and prosecuting Causes of Action that are transferred to the M&E Trust pursuant to the Plan.  The M&E Trust will not continue or engage in the conduct of a trade or business.

(ii)     <u>M&E Trust Assets</u>.  On the Effective Date, all right, title and interest to the following assets of the Debtor and its Estate will be assigned, set over, transferred, and conveyed to the M&E Trust, free and clear of Liens, Claims or encumbrances and without action required of the M&E Trustee to effectuate the transfer of M&E Trust Assets:

(A)     Balance of the cash consideration relating to the Sale, or approximately $2.75 million, subject to potential adjustment;

(B)     the Excluded Assets; and

(C)     the M&E Trust Note.

To the extent that certain M&E Trust Assets, because of their nature or because they will accrue subsequent to the Effective Date, cannot be assigned, set over, transferred or conveyed to the M&E Trust on the Effective Date, these assets will be deemed assigned, set over, transferred and conveyed to the M&E Trust as soon as practical after the Effective Date.  The M&E Trust Assets shall not include any contractual rights of subordination, guarantees or judgments which are retained by the Pre-Petition Lenders or the Agent on their behalf.  On or after the Effective Date, with respect to all Claims constituting Excluded Assets, the M&E Trustee will continue as a plaintiff in Causes of Action (on behalf of the Beneficiaries) of the M&E Trust in which the Debtor was a plaintiff prior to the Effective Date and will be deemed the assignee of all Claims or Causes of Action that could have otherwise been asserted by the Debtor or a trustee of the Debtor if one were appointed.  All recoveries and proceeds arising from litigation and Causes of

Action that are Excluded Assets will be deemed assigned, set over, transferred and conveyed to the M&E Trust upon receipt thereof.

(iii) <u>Governance of the M&E Trust</u>. The M&E Trust will be controlled by the M&E Trustee in accordance with the M&E Trust Agreement, which will not be inconsistent with the Plan. The M&E Trustee will be subject to oversight by a three member oversight committee (the "<u>Oversight Committee</u>"). The Oversight Committee will be comprised of (i) one representative selected by the Committee, (ii) one representative selected by the Agent, and (iii) a third representative selected by and agreed upon by the Committee and Agent representatives. The Oversight Committee shall be compensated by the M&E Trust in amounts set forth in the Confirmation Order.

(iv) <u>The M&E Trustee</u>. The M&E Trustee will be JLL Consultants, as selected by the Committee and the Agent. The designation of the M&E Trustee will be approved by the Bankruptcy Court and effective on the Effective Date without the need for a further order of the Bankruptcy Court. The M&E Trustee will exercise reasonable business judgment to administer the M&E Trust Assets and make timely distributions from the M&E Trust to the Beneficiaries of the M&E Trust.

(v) <u>Costs and Expenses of the M&E Trustee</u>. The costs and expenses of the M&E Trust, including the fees and expenses of the M&E Trustee and its retained professionals, will be paid from the proceeds of M&E Trust Assets. These costs and expenses will have a first priority in right of distribution and subordinate, however, to Compensation and Reimbursement Claims addressed in Section 2.3 of the Plan and are not subject to approval by the Bankruptcy Court. The M&E Trustee may retain or reserve amounts estimated by the M&E Trustee, based on his reasoned business judgment, to fund the fees and expenses of the M&E Trustee and the professionals of the M&E Trustee in a Liquidation Expense Reserve Account. The M&E Trust may increase or decrease amounts held in a Liquidation Trust Reserve Account at the reasonable discretion of the M&E Trustee. The M&E Trustee shall submit a three (3) month budget for approval to the Oversight Committee on an ongoing basis, which approval shall not unreasonably be withheld.

(vi) <u>Compensation of the M&E Trustee</u>. The M&E Trustee intends to be paid a monthly flat fee and certain contingency amounts which shall be set forth in the Plan Supplement at Exhibit E and approved in the Confirmation Order.

(vii) <u>Distribution of Trust Assets</u>. The M&E Trustee will make distributions of proceeds of M&E Trust Assets to Beneficiaries at the discretion of the M&E Trustee and in accordance with the M&E Trust Agreement, and this Plan, except such amounts (i) that would otherwise be distributable to a holder of a Disputed Claim if such Disputed Claim had been Allowed prior to the time of such distribution (but only until such Claim is Allowed); (ii) that are reasonably necessary to meet future costs of administration and contingent liabilities and to maintain the value of the assets of the M&E Trust during administration of the M&E Trust and M&E Trust Assets; (iii) to pay reasonable expenses (including, but not limited to, any taxes imposed on the assets of the M&E Trust or in respect of the M&E Trust); and (iv) to satisfy other obligations and liabilities incurred by

the M&E Trust as authorized by the M&E Trustee, or obligations and liabilities incurred by the Debtor, in accordance with this Plan or the M&E Trust Agreement.

(viii)   Retention of Professionals by the M&E Trustee.  The M&E Trustee will retain McGuireWoods LLP as primary counsel to the M&E Trust.  The M&E Trustee will retain Walker Nell to provide financial advisory services.  The M&E Trustee may retain and reasonably compensate such additional counsel and other professionals to assist in its duties as the M&E Trustee.  The M&E Trustee may retain any professional who represented parties in interest (including the Debtor or the Committee) in the Case.  The M&E Trustee will retain legal counsel on a contingency fee basis to pursue certain Causes of Action that constitute M&E Trust Assets.

(ix)   Authority to Settle and Grant Releases.  The M&E Trustee is authorized to compromise, settle, release and discharge Claims against the Estate (that are unrelated to Purchased Assets) or Causes of Action to the fullest extent permitted by law without further order of the Bankruptcy Court; provided, however, that for Claims or Causes of Action asserted in amounts in excess of $250,000, prior approval by the Oversight Committee and Bankruptcy Court is required.

(x)   Attorney-Client Privilege.  On the Effective Date, any attorney-client privilege, work-product privilege or other privilege or immunity that the Debtor or the Estate are entitled to assert will vest in the M&E Trust (and the attorneys and agents of the M&E Trust) and the M&E Trustee shall be entitled to assert or waive privileges and immunities to the same extent that the Debtor was entitled to do so prior to the Effective Date.

(xi)   Transfer of Claims of Debtor and the Estate to M&E Trust.  A full investigation of potential Claims and Causes of Action has not been undertaken by either the Debtor or the Committee.  Potential Claims and Causes of Action may exist as against, among others, (i) Persons (and/or subsidiaries and affiliates thereof) identified in items 3(a) and 3(b) of the Debtor's Statement of Financial Affairs (and other Persons subsequently discovered by the Debtor, the Committee or M&E Trustee as having received payments that should have been listed and identified in item 3(a) or 3(b) of the Debtor's Statement of Financial Affairs, but were not); and (ii) other Claims and Causes of Action identified by the M&E Trustee in the course of his post-Effective Date due diligence.  On the Effective Date, the M&E Trustee will be substituted for the Debtor or Committee as party in any pending Cause of Action, adversary proceeding, contested matter, motion or action pending in the Bankruptcy Court or any other court arising from or relating to an Excluded Asset.

(xii)   Reservation of Causes of Action.  All Claims and Causes of Action constituting an Excluded Asset are expressly reserved for the benefit of the M&E Trust and its Beneficiaries, including, without limitation, potential Claims and Causes of Action against, among others:

(A)   Persons (and/or subsidiaries and affiliates thereof) identified in the Debtor's items 3(a) and 3(b) of the Debtor's Statement of Financial Affairs (and other Persons subsequently discovered by the Debtor, the Committee or M&E

Trustee as having received payments that should have been listed and identified in item 3(a) or 3(b) of the Debtor's Statement of Financial Affairs but were not);

(B)     Gary L. Reinert, Sr., in his personal capacity and in the capacity as director and/or officer of the Debtor. Without limiting the scope of this reservation, all Claims and Causes of Action relating to actions/inactions committed, directed or authorized by Gary L. Reinert, Sr., in any capacity with the Debtor are expressly reserved as well as all Causes of Action relating to Pre-Petition and Post-Petition transfers from the Debtor to Gary L. Reinert, Sr. and/or the Reinert Entities, potential Causes of Action under applicable corporate/business/fiduciary law, and other Claims and Causes of Action arising from or relating to ownership, management, control and other interactions and transactions among the Debtor, Gary Reinert, Sr. and/or the Reinert Entities;

(C)     the Reinert Entities and all Persons related thereto or associated therewith.  Without limiting the scope of this reservation, all Causes of Action relating to the aforementioned parties' involvement with the Debtor, including, without limitation Post-Petition and Pre-Petition transfers from the Debtor to or for the benefit of the Reinert Entities, are expressly reserved;

(D)     all Claims and Causes of Action against "insiders" as that term is defined in 11 U.S.C. § 101, including, but not limited to any and all Claims that may be covered under an Insurance Policy; and

(E)     all creditors that secured judgments or liens within ninety days prior to the Petition Date, or may otherwise be subject to an Avoidance Action, including, without limitation, the judgments of Donald H. Malenick.

(xiii)   Federal Income Tax Treatment of M&E Trust.  For all federal income tax purposes, all parties (including, without limitation, the Debtor, the M&E Trustee and the Beneficiaries) are required to treat the transfer of the M&E Trust Assets to the M&E Trust for the benefit of the Beneficiaries of the M&E Trust, whether the Claims of such Beneficiaries are allowed prior to the Effective Date, as (A) a transfer of the M&E Trust Assets directly to the Beneficiaries (other than to the extent allocable to Disputed General Unsecured Claims) followed by (B) the transfer by the Beneficiaries of M&E Trust Assets to the M&E Trust in consideration of beneficial interests in the M&E Trust. Beneficiaries of the M&E Trust will be treated for federal income tax purposes as the grantors and owners of their respective interests of the M&E Trust Assets.

(xiv)   Tax Reporting.  The M&E Trustee will file any necessary tax returns for the Debtor for the period prior to the Effective Date and for the M&E Trust as a grantor trust pursuant to Treasury Regulation section 1.671-1 through 4(a) and in accordance with the Plan.

(xv)    Subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary (including the receipt by the M&E Trustee of a private letter ruling if the M&E Trustee so requests one, or the receipt of an adverse determination by the Internal Revenue Service upon audit if not contested by the M&E

Trustee), the M&E Trustee will (i) treat any M&E Trust Assets allocable to, or retained on account of, Disputed Claims as held by one or more discrete trusts for federal income tax purposes (the "Disputed Claim Reserve") in accordance with the trust provisions of the Tax Code (section 641 *et seq.*); (ii) treat as taxable income or loss of the Disputed Claim Reserve, with respect to any given taxable year, the portion of the taxable income or loss of the M&E Trust that would have been allocated to the holders of Disputed Claims had such Claims been Allowed on the Effective Date (but only for the portion of the taxable year with respect to which such Claims are unresolved); (iii) treat as a distribution from any reserve established under the M&E Trust any increased amounts distributed by the M&E Trust as a result of any Disputed Claims resolved earlier in the taxable year, to the extent such distributions relate to taxable income or loss of the M&E Trust determined in accordance with the provisions hereof; and (iv) to the extent permitted by applicable law, report consistent with the foregoing for state and local income tax purposes. All holders of Allowed General Unsecured Claims shall report, for tax purposes, consistent with the foregoing.

(xvi)    The M&E Trustee will be responsible for payments, out of, and only to the extent of, the M&E Trust Assets, of any taxes imposed on the Debtor, the Estate, the M&E Trust or the M&E Trust Assets, including any Disputed Claim Reserve established under the M&E Trust. In the event, and to the extent, any Cash retained on account of Disputed General Unsecured Claims in any Disputed Claim Reserve established under the M&E Trust is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed General Unsecured Claims, such taxes may be (i) reimbursed from any subsequent Cash amounts retained on account of Disputed General Unsecured Claims, or (ii) to the extent such Disputed General Unsecured Claims have subsequently been resolved, deducted from any amounts distributable by the M&E Trustee as a result of the resolutions of such Disputed General Unsecured Claims.

(xvii)   Reservation for the United States.    The United States Internal Revenue Service right to challenge the tax treatment of the M&E Trust as stated in the Plan is reserved.

(xviii) Dissolution.   The M&E Trust will be dissolved and the M&E Trustee discharged at such time as (i) all Disputed Claims, whether classified or unclassified of potential Beneficiaries of the M&E Trust have been resolved, (ii) all M&E Trust Assets have been monetized, liquidated or abandoned and (iii) all distributions required to be made by the M&E Trustee under the Plan and M&E Trust Agreement have been made. In no event will the M&E Trust be dissolved after a period that would adversely affect the status of the M&E Trust as a liquidating trust for federal income tax purposes. The M&E Trust will only exist as long as is necessary to facilitate or complete the recovery and liquidation of the M&E Trust Assets and distribution of their proceeds to Beneficiaries of the M&E Trust. The M&E Trustee will not unduly prolong the duration of the M&E Trust and will at all times endeavor to resolve, settle or otherwise dispose of all Claims that constitute M&E Trust Assets and effect the distribution of the M&E Trust Assets in accordance with the terms of the Plan and the M&E Trust Agreement. M&E Trust Assets will be distributed to the Beneficiaries of the M&E Trust pursuant to the

provisions set forth in Section IV of the M&E Trust and Sections 4.5 and 6.2(a)(vii) of the Plan.

(xix)  <u>Indemnification of M&E Trustee</u>.  The M&E Trustee and the M&E Trustee's agents and professionals will not be liable for actions taken or omitted in their capacity as, or on behalf of, the M&E Trustee, except those acts or omissions arising out of willful misconduct or gross negligence, and each of the M&E Trustee, the M&E Trustee's agents and the M&E Trustee's professionals will be entitled to indemnification and reimbursement for fees and expenses in defending any and all of its actions or inactions in its capacity as, or on behalf of, the M&E Trustee, except for any actions or inactions involving willful misconduct or gross negligence. Any indemnification claim of the M&E Trustee (and the other parties entitled to indemnification under the Plan) will be satisfied from M&E Trust Assets prior to distributions to Beneficiaries of the M&E Trust. The M&E Trustee will be entitled to rely, in good faith, on the advice of its retained professionals.

### 5.3    **Effectuating the Sale.**

(a)  <u>Approval of the Sale and Authorization to Perform</u>.  The filing of the Plan will be deemed to constitute a motion for an order of the Bankruptcy Court approving, pursuant to Bankruptcy Code sections 105, 365, 1123 and 1129(b)(2)(A)(ii), the Agreement and actions contemplated thereunder, including without limitation, the sale of the Acquired Assets free and clear of all Liens, Claims, encumbrances, and any and all other interests, except as otherwise provided in the Plan and Agreement.  The Plan and the Confirmation Order shall be presumptively deemed to comply with all requirements of the Bankruptcy Code, and the Bankruptcy Rules.  Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Agreement and authorization for the Debtor, the Purchaser, and the M&E Trustee to effectuate all transactions contemplated therein.

(i)  On the Effective Date, the Debtor, Purchaser, and M&E Trustee, as applicable, will each execute all documents and take other actions necessary or required to transfer, sell and convey, and where applicable, assume and assign, all of the Acquired Assets to the Purchaser and otherwise effectuate all transactions contemplated under the Agreement and the Plan.

(b)  <u>Sale Consideration</u>.  On the Effective Date, the Purchaser will pay the Total Consideration, with an aggregate value of approximately $24,854,516 (subject to adjustment), taking into account Cash consideration, Assumed Liabilities and the M&E Trust Note.

(c)  <u>Transfer of Acquired Assets</u>.  On the Effective Date, the Sale will be consummated and the Acquired Assets sold, transferred, conveyed, assumed and assigned from the Debtor to the Purchaser, free and clear of Liens, Claims and encumbrances except as otherwise provided in the Plan and the Agreement.  The Debtor will execute all documents necessary to sell, transfer, convey, assume and assign the Acquired Assets as contemplated under the Agreement.

In consideration of the sale, transfer, conveyance, assumption and assignment of the Acquired Assets by the Debtor to the Purchaser, the Purchaser will:

> (i)  Pay the Cash consideration, subject to adjustment, to the M&E Trust or as otherwise directed under the Plan;

> (ii)  Execute the M&E Trust Note;

> (iii)  Accept assignment of the Acquired Contracts;

> (iv)  Assume and pay Allowed Cure Claims in accordance with the Agreement;

> (v)  Assume and pay all amounts required to be paid by Purchaser on the Effective Date (or when otherwise due) with respect to Assumed Liabilities identified in sections 4.2, 4.3 and 4.4 of the Plan and Administrative Claims other than Retained Administrative Expense Claims as provided under section 2.1 of the Plan; and

> (vi)  Execute all documentation necessary to evidence the assumption of obligations with respect to Classes 2, 3 and 4, Administrative Expense Claims other than Retained Administrative Expense Claims and Allowed Cure Claims as provided under section 2.1 of the Plan that are not paid on the Effective Date.

### 5.4  Transfer Taxes.

Pursuant to section 1146(a) of the Bankruptcy Code, the consummation of the transactions contemplated by the Agreement and Plan, including but not limited to the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument of transfer (including, without limitation, any deeds, bills of sale or assignments executed in connection with any disposition of assets contemplated by the Plan) will be deemed to be in furtherance of or in connection with the Plan and will not be subject to any stamp, real estate transfer, mortgage recording or other similar tax.

### 5.5  Corporate Action.

On the Effective Date, all actions contemplated to be performed by the Debtor pursuant to the Sale Documents are authorized and approved in all respects. All actions required of the Debtor under the Sale Documents or the M&E Trust Agreement will not require any action by the holders of Equity Interests or directors of the Debtor. Mark A. Roberts, the Chief Restructuring Officer and Chief Executive Officer of the Debtor, is authorized and directed to execute and deliver the agreements, documents and instruments contemplated by the Sale Documents (including the Agreement) necessary to effectuate the transactions contemplated therein, without approval of the Debtor's board of directors, any individual officer or director, or any holder of Equity Interests in the Debtor. All Persons, the Purchaser, Governmental Units, title agencies, licensing agencies and offices of recordation may rely upon the authority vested in Mark A. Roberts to act on the Debtor's behalf in order to effectuate the Plan and the transactions contemplated in the Agreement.

### 5.6 Vesting of Assets in the M&E Trust.

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan, pursuant to sections 1123(a)(5), 1123(b)(3) and 1141(b) of the Bankruptcy Code, on the Effective Date, all property of the Estate constituting Excluded Assets will vest in the M&E Trust free and clear of all Liens, Claims, charges, or other encumbrances.

### 5.7 Distributions.

Distributions will be made in accordance with the Plan.

### 5.8 Subrogation Claims.

All Subrogation Claims of the Debtor and the Estate will be assigned and transferred to the M&E Trust on the Effective Date.

### 5.9 Cancellation of Notes, Instruments, Certificates and Other Documents.

On the Effective Date, except to the extent otherwise provided in the Plan, all notes, instruments, certificates, and other documents evidencing Claims or Interests will be cancelled and the obligations of the Debtor discharged in accordance with section 1141(d)(1) of the Bankruptcy Code. Subordination agreements in favor of the Agent shall survive the Effective Date. Notwithstanding the foregoing, the Pre-Petition Bank Debt and related loan documents shall remain in full force and effect, except as expressly modified in the Plan.

### 5.10 Cancellation of Existing Securities and Agreements.

On the Effective Date, except as expressly provided in this Plan, the securities, promissory notes, trust indentures, share certificates, security agreements, deeds of trust, collateral agency agreements and other instruments evidencing or securing a Claim will be deemed cancelled without further act or action under any applicable agreement or law, and the obligations of the Debtor under the agreements, instruments, trust indentures and certificates governing and securing such Claims, as the case may be, will be discharged. Subordination agreements in favor of the Agent shall survive the Effective Date. Subordination agreements in favor of the Agent shall survive the Effective Date.

### 5.11 Release of Liens.

Except as otherwise specifically provided in the Plan or in any contract, instrument or other agreement or document created in connection with the Plan, (i) each holder of: (a) any purported Secured Claim and/or (b) any judgment, personal property or *ad valorem* tax, molder, warehouse or artisan or similar Lien Claim, in each case regardless of whether such Claim is an Allowed Claim, shall, on or immediately before the Effective Date and regardless of whether such Claim has been scheduled or proof of such Claim has been filed: (y) turn over and release to the Estate any and all property of the Debtor or the Estate that secures or purportedly secures such Claim, or such Lien and/or Claim shall automatically, and without further action by the Debtor or the M&E Trustee, as the case may be, be deemed released and (z) execute such documents and instruments as the Debtor or M&E Trustee, as the case may be, requires to

evidence the holder of a Claim's release of such property or Lien, and if such holder refuses to execute appropriate documents or instruments, the Debtor or the M&E Trustee, as the case may be, in its discretion, file a copy of the Confirmation Order in the appropriate recording office, which shall serve to release any holder of a Claim's rights in such property; and (ii) immediately before the Effective Date, all right, title and interest in such property shall revert or be transferred to the Debtor, free and clear of all Claims, interests, and Liens of any kind, and thereafter be transferred to the Purchaser and the M&E Trust, as applicable.

### 5.12   Books and Records.

Debtor or its designee will retain possession of all accounting, business, financial and tax records and information (i) relating to the Acquired Assets or the Assumed Liabilities that are in existence on the Effective Date and transferred to Purchaser and (ii) coming into existence after the Effective Date that relate to the Acquired Assets or the Assumed Liabilities before the Closing Date, for a period not to exceed the period in which the M&E Trust remains in existence.  Debtor or its designee shall give Purchaser at least sixty (60) days prior written notice and an opportunity to retain or copy any such records in the event that Debtor or its designee determines to destroy or dispose of them.  In addition, from and after the Effective Date, Debtor or its designee shall provide access to Purchaser and its designees, (after reasonable notice and during normal business hours and without charge), to the books, records, documents and other information relating to the Acquired Assets or the Assumed Liabilities as Purchaser may reasonably deem necessary.  Such access shall include, without limitation, access to any computerized information retrieval systems relating to the Acquired Assets or the Assumed Liabilities.

### 5.13   Closing of Case by Charitable Gift.

If at any time the M&E Trustee determines that the expense of administering the M&E Trust or distributing M&E Trust Assets to Beneficiaries is likely to exceed the value of the M&E Trust Assets remaining in the M&E Trust, the M&E Trustee may (i) reserve any amounts necessary to close the Case; (ii) donate any balance of M&E Trust Assets or their proceeds to a charitable organization exempt from federal income tax under section 501(c)(3) of the Tax Code that is unrelated to the Debtor and any insider of the Debtor; and (iii) close the Case in accordance with the Bankruptcy Code and Bankruptcy Rules.

## ARTICLE VI - PROCEDURES FOR DISPUTED CLAIM

### 6.1   Objections to Claims.

On and after the Effective Date, the M&E Trust will be entitled to object to all Claims of potential beneficiaries of the M&E Trust.  The Purchaser will be entitled to object only to Claims constituting Assumed Liabilities under the Sale Documents.

### 6.2   No Distribution Pending Allowance.

Notwithstanding any other provision of the Plan, if any portion of a Claim is a Disputed Claim, no payment or distribution to the holder of such Disputed Claim will be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

### 6.3 Reserve on Account of Disputed Claims.

(a) **Establishment and Maintenance of Reserve for Disputed Claims.** Solely for Claims for which the M&E Trustee is the Responsible Distribution Agent, the M&E Trustee will maintain a Disputed Claim Reserve at an amount equal to the aggregate of 100% of the distributable amounts to which holders of such Disputed Claims would be entitled under the Plan if such Disputed Claims were Allowed Claims in their Disputed Claim Amounts or such lesser amount as required by a Final Order. For purposes of effectuating the provisions of section 7.3(a) of the Plan and the distributions to holders of Allowed Claims, the Bankruptcy Court may set, fix or liquidate the amount of Disputed Claims pursuant to section 502(c) of the Bankruptcy Code, in which event the amounts so fixed or liquidated will be deemed the amounts of the Disputed Claim for purposes of distribution under this Plan. In lieu of fixing or liquidating the amount of any Disputed Claim, the M&E Trustee may request that the Bankruptcy Court determine the amount to be reserved for such Disputed Claim or such amount may be fixed by agreement in writing between the the M&E Trustee and the holder of a Disputed Claim.

(b) **Distributions on Allowance of Disputed Claims.** The holder of a Disputed Claim that becomes an Allowed Claim will receive distribution (i) in Cash from the Disputed Claim Reserve of the M&E Trustee for Claims against the Estate for which the M&E Trustee is the Responsible Distribution Agent, or (ii) from the Purchaser per the terms of the Plan or as agreed between the Purchaser and the holder of an Allowed Claim for which the Purchaser is the Responsible Distribution Agent, as soon as practical following the date on which such Disputed Claim becomes an Allowed Claim pursuant to a Final Order. These distributions will be made in accordance with the Plan based on the distribution(s) that would have been made to such holder under the Plan if the Disputed Claim had been an Allowed Claim on or prior to the Effective Date. No holder of a Disputed Claim will have any Claim against the Disputed Claim Reserve or the applicable Responsible Distribution Agent with respect to such Claim until such Disputed Claim becomes an Allowed Claim, and no holder of a Disputed Claim will have any right to interest on such Disputed Claim except for any Reserve Income earned thereon (unless otherwise required pursuant to applicable non-bankruptcy law for Priority Tax Claims).

### 6.4 Resolution of Disputed Claims.

Unless otherwise provided in the Plan or ordered by the Bankruptcy Court after notice and a hearing, following the Effective Date, the applicable Responsible Distribution Agent will have the exclusive right to file objections to Claims. Each objection must be served on the holder of the Claim to which the objection is made as soon as practicable, but in no event later than ninety (90) days after entry of the Post-Confirmation Order and Notice (subject, however, to the right of the Responsible Distribution Agent to seek an order of the Bankruptcy Court granting an extension of time to file such objections with the Bankruptcy Court).

### 6.5 Estimation.

The Debtor, or following the Effective Date, the applicable Responsible Distribution Agent may at any time request that the Bankruptcy Court estimate any contingent, unliquidated or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtor previously objected to such Claim, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtor or the Responsible Distribution Agent (as the case may be) may pursue supplementary proceedings to object to the allowance of such Claim. All objection, estimation and Claim resolution procedures are intended to be cumulative and not exclusive of one another.

### 6.6 Distributions to Holders of Allowed Claims Upon Disallowance of Disputed Claims.

On disallowance of any Disputed Claim, each holder of an Allowed Claim in the same Class as the disallowed Disputed Claim will be entitled to its *Pro Rata* share of Cash equal to the distribution that would have been made in accordance with the Plan to the holder of such Disputed Claim had such Disputed Claim been an Allowed Claim on or prior to the Effective Date. Such distributions on account of disallowed Disputed Claims will be made as soon as practicable. On allowance or disallowance of all or a portion of such Disputed Claims, the applicable Responsible Distribution Agent will make appropriate distributions in accordance with the Plan.

## ARTICLE VII - TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 7.1 Rejection of Executory Contracts and Unexpired Leases.

(a)     <u>General Treatment</u>.  On the Effective Date, all executory contracts and unexpired leases to which the Debtor is a party shall be deemed automatically rejected in accordance with the provisions and requirements of sections 365 and 1123(b)(2) of the Bankruptcy Code as of the Effective Date, unless any such executory contract or unexpired lease: (i) has been previously subject to a Final Order of the Bankruptcy Court authorizing assumption/assignment or rejection, as the case may be, entered prior to the Effective Date; (ii) is the subject of a motion to assume, assume and assign or reject pending as of the Effective Date; or (ii) is listed on the Schedule of Assumed Executory Contracts and Unexpired Leases which is Exhibit C to the Plan Supplement.

(b)     <u>Rejection Damages</u>.  The Confirmation Order, as of the Effective Date, will constitute an order of the Bankruptcy Court authorizing and approving (i) the assumption and assignment of executory contracts identified in Exhibit C to the Plan Supplement and (ii) the rejection of all other Executory Contracts of the Debtor which are not otherwise identified in Exhibit C to the Plan Supplement or subject to a motion

to assume/assume and assign executory contracts pending as of the Effective Date. Exhibit C may be amended by the Purchaser from time to time up through and including the conclusion of the Consolidated Confirmation Hearing. Counterparties to executory contracts or unexpired leases that are deemed rejected as of the Effective Date will be permitted to assert any Claim on account of the rejection of such executory contracts or unexpired leases, including under section 502(g) of the Bankruptcy Code, subject to compliance with the requirements of the Plan. Unless otherwise provided by a Bankruptcy Court order, any proofs of claim asserting Claims arising from the rejection of the Debtor's executory contracts and unexpired leases pursuant to the Plan or otherwise must be filed with the Bankruptcy Court no later than thirty days after the Effective Date. Any proofs of claim arising from the rejection of the Debtor's executory contracts or unexpired leases that are not timely filed will be disallowed automatically, and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against the M&E Trustee, without the need for any objection the M&E Trustee or any further notice to or action, order, or approval of the Bankruptcy Court, and any Claim arising out of the rejection of the executory contract or unexpired lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary. All Allowed Claims arising from the rejection of the Debtor's executory contracts and unexpired leases shall be classified as General Unsecured Claims.

**7.2    Assumption of Executory Contracts and Unexpired Leases.**

(a)    <u>Assumption of Executory Contracts and Unexpired Leases</u>. On the Effective Date, the Debtor will assume and assign to the Purchaser all of the executory contracts and unexpired leases listed on the Schedule of Assumed Executory Contracts and Unexpired leases attached to the Plan Supplement as Exhibit C. Exhibit C may be amended by the Purchaser from time to time up through and including the conclusion of oral presentations at the Consolidated Confirmation Hearing and the submission to the Court by the Plan Proponents of a proposed Confirmation Order. With respect to the executory contracts and unexpired leases listed on the Schedule of Assumed Executory Contracts and Unexpired Leases, the Debtor, in consultation with the Purchaser, will designate a proposed Allowed Cure Claim on the Schedule of Assumed Executory Contracts and Unexpired Leases which Schedule of Assumed Executory Contracts and Unexpired Leases will include Cure Costs identified in <u>Schedule 2.3</u> of the Agreement. Counter-parties whose executory contracts and unexpired leases are identified in Exhibit C to the Plan Supplement and whose Cure Claims, if any, are identified in <u>Schedule 2.3</u> to the Agreement will have fourteen (14) days (but no later than August 2, 2010) from the date of receipt of <u>Schedule 2.3</u> to file an objection to Cure Claims with the Bankruptcy Court; otherwise, such Cure Claims will be deemed to be Allowed Claims in the amount identified in <u>Schedule 2.3</u>.

(b)    <u>Modifications, Amendments, Supplements, Restatements, or Other Agreements</u>. Unless otherwise provided in the Plan, each executory contract or unexpired lease that is assumed pursuant to the Agreement and the Plan will include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such executory contract or unexpired lease, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options,

and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated, or is rejected or repudiated pursuant to the Plan, the Agreement or separate motion and Final Order of the Bankruptcy Court. Modifications, amendments, supplements, and restatements to prepetition executory contracts and unexpired leases that have been executed by the Debtor during the Case will not alter the prepetition nature of the executory contract or unexpired lease, or the validity, priority, or amount of any Claims in connection therewith.

(c)     Modification of the Schedule of Assumed Executory Contracts and Unexpired Leases. The Schedule of Assumed Executory Contracts and Unexpired Leases may be modified by the Purchaser to add or delete contracts and leases after the conclusion of oral presentations at the Consolidated Confirmation Hearing until the Plan Proponents submit a proposed Confirmation Order to the Court. The Plan Proponents have agreed not to submit a proposed Confirmation Order to the Court until at least two hours after the conclusion of oral presentations at the Consolidated Confirmation Hearing, however, Schedule 2.3 identifying Cure Claims may not be modified after the hearing on allowance of Cure Claims unless otherwise agreed by the applicable contract counter-party.

(d)     Proof of Claim Based on Executory Contracts or Unexpired Leases that Have Been Assumed. Any and all Proofs of Claim relating to executory contracts or unexpired leases that have been assumed in the Case and assigned to the Purchaser will be deemed amended and superseded by the amount of the Allowed Cure Claim identified in Exhibit C to the Plan Supplement (the Schedule of Assumed Executory Contracts and Unexpired Leases), the Confirmation Order or other order of the Bankruptcy Court authorizing assumption of executory contracts to the Debtor and assignment of these contracts to Purchaser.

(e)     Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. With respect to each of the executory contracts or unexpired leases listed on the Schedule of Assumed Executory Contracts and Unexpired Leases, the Debtor or the Purchaser will designate a proposed Cure and the assumption and assignment of such executory contract or unexpired lease will be conditioned on the disposition of all issues with respect to Cure. All Allowed Cure Claims, up to an aggregate amount set forth on Schedule 2.3 of the Agreement (subject to adjustment), will be satisfied by Purchaser by payment of the Allowed Cure Claim in Cash on the Effective Date or as soon as reasonably practicable thereafter, or on such other terms as may be either: (i) ordered by the Bankruptcy Court or (ii) agreed by the Purchaser, and applicable contract counter-party without any further notice to or action, order, or approval of the Bankruptcy Court. Any provisions or terms of the Debtor's executory contracts or unexpired leases to be assumed and assigned pursuant to the Plan that are, or may be, alleged to be in default, shall be satisfied solely by the Cure, or by an agreed-upon waiver of the Cure. In the event all Allowed Cure Claims relating to (i) Unexpired Leases exceed in the aggregate or on a Purchased Store by Purchased Store basis amounts set forth in Schedule 2.3 of the Agreement, or (ii) Executory Contracts exceed $90,000, the Debtor will be responsible for all such amounts in accordance with Section 2.1 of the Agreement.

(i)     **Cure Dispute Resolution Process (IMPORTANT BAR DATE).** **The following process shall govern disputes relating to Cure:**

(A)     Counterparties to any executory contract and unexpired leases (I) designated for assumption on the Schedule of Assumed Executory Contracts and Unexpired Leases and (II) that dispute the proposed Cure Cost listed on Schedule 2.3 of the Agreement or dispute assumption and assignment of an Acquired Contract for any other reason must serve counsel to the Debtor, the Purchaser and the Committee any objection to the proposed Cure Cost ("Cure Objection") so that it is received no later than August 2, 2010.

(B)     The Cure Objection should include: (1) the Cure Claim asserted by the objecting contract counter-party; (2) documentation that substantively and quantitatively supports the Cure Claim alleged by the objecting contract-counter party; (3) contact information of the counterparty (including but not limited to email, fax and telephone numbers at which the counterparty can be reached), and (4) the legal and factual basis for an objection to assumption and assignment of a proposed Acquired Contract.

(C)     The Debtor (in consultation with the Committee), Purchaser and the objecting counterparty will promptly, following receipt of the Cure Objection, commence good faith negotiations of the Cure Objection.

(D)     If a Cure Objection dispute cannot be resolved by within three (3) days before the Consolidated Confirmation Hearing, the Debtor will file a notice of disputed Cure ("Cure Dispute Notice") with the Bankruptcy Court and Cure Objection disputes will be addressed by the Bankruptcy Court prior to the conclusion of the Consolidated Confirmation Hearing.

(E)     The Purchaser may delete executory contracts and unexpired leases from the Schedule of Assumed Executory Contracts and Unexpired Leases at any time up to the submission by the Plan Proponents of a proposed Confirmation Order to the Court.  The Plan Proponents will not submit a proposed Confirmation Order to the Court until at least two hours after the conclusion of the presentation of all other evidence and argument at the Consolidated Confirmation Hearing.

(F)     Failure to comply with the Cure Objection dispute resolution process will result in the disallowance of the Cure Claim.  The contract counterparty will be forever barred, estopped, and enjoined from asserting a Cure Claim against the Purchaser, the Estate or the M&E Trust in an amount that exceeds the amount listed in Schedule 2.3 of the Agreement.  In instances where an

executory contract is to be assumed pursuant to the Agreement and the Plan and no Cure Objection has been timely filed with the Bankruptcy Court by the applicable contract counter-party, the Cure Cost listed on <u>Schedule 2.3</u> of the Agreement (notwithstanding anything included in the Schedules or in any Proof of Claim to the contrary) will be binding on all parties, including the Purchaser and contract counter-party. The Debtor, with approval of the Purchaser and Committee, may settle any Cure Objection without any further notice to or action, order, or approval of the Bankruptcy Court.

(f) Entry of the Confirmation Order will constitute a finding of adequate assurance of future performance by the Purchaser within the meaning of section 365 of the Bankruptcy Code. Objections relating to adequate assurance of future performance, or any other matters relating to the assumption and assignment of executory contracts and unexpired leases (other then Cure Claim disputes) must be asserted as an objection to confirmation of the Plan. Assumption of any executory contract or unexpired lease pursuant to the Confirmation Order or other order of the Bankruptcy Court will limit the Claims of any such contract counter-party to the (i) Allowed Cure Claim and (ii) Claims for ongoing performance under the unexpired lease or executory contract by Purchaser pursuant to section 365(k) of the Bankruptcy Code.

## ARTICLE VIII - CONDITIONS PRECEDENT TO EFFECTIVENESS OF THE PLAN

### 8.1 Conditions Precedent to Effective Date.

The following are conditions precedent to the Effective Date of the Plan:

(a) The Bankruptcy Court has approved the Disclosure Statement and entered the Confirmation Order;

(b) no stay of the Confirmation Order is in effect;

(c) Purchaser closes on the Sale and provides all consideration required under the Sale Documents;

(d) All documents required to be executed by Purchaser to implement the Plan and close the Sale have been executed by Purchaser; and

(e) The Effective Date occurs no later than August 31, 2010.

### 8.2 Waiver of Conditions Precedent.

Subject to Purchaser written consent, the Debtor, with the written consent of the Committee and PNC Bank, as Agent, has the right to waive the conditions set forth in section 9.1 of the Plan other than section 9.1(a).

### 8.3 Effect of Nonoccurrence of Conditions to Effective Date.

If the Debtor and the Committee and PNC Bank, as Agent to the extent applicable, determine that one of the conditions precedent set forth in section 9.1 of the Plan cannot be satisfied and are not waived pursuant to section 9.2 of the Plan, then the Plan Proponents will file a notice with the Bankruptcy Court and the Confirmation Order may be vacated following notice and hearing. If the Confirmation Order is vacated pursuant to section 9.3 of the Plan, the Plan will be null and void in all respects.

## ARTICLE IX - EFFECT OF CONFIRMATION

### 9.1 Vesting of Assets.

On the Effective Date, (i) all property of the Estate that is an Excluded Asset will vest in the M&E Trust free and clear of all Claims and Liens, except as provided in the Plan or the Confirmation Order.

### 9.2 Binding Effect.

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, on and after the Effective Date, the provisions of the Plan are binding on all holders of Claims against, or Equity Interests in the Debtor and their respective successors and assigns, whether or not a Claim or Equity Interest of a holder is Impaired or Unimpaired under the Plan and whether or not such holder has accepted the Plan.

### 9.3 Discharge of Claims and Termination of Equity Interests.

Except as otherwise specifically provided in the Plan or in the Confirmation Order, the rights granted under the Plan and the payments and distributions to be made under the Plan discharge all existing debts and Claims, and terminate all Equity Interests of any kind, nature or description, whatsoever, in or against the Debtor, the Estate, their assets or properties to the fullest extent permitted by section 1141 of the Bankruptcy Code. Except as otherwise provided under the Plan or in the Confirmation Order, on the Effective Date, all existing Claims against the Debtor and the Estate will be discharged and terminated, and all holders of Claims and Equity Interests will be precluded and enjoined from asserting against the Debtor, the Estate or any of its assets or properties, any other or further Claim or Equity Interest based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a Proof of Claim or is listed in the Schedules.

### 9.4 Discharge of the Debtor.

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in this Plan or in the Confirmation Order, the distributions and rights that are provided in this Plan will be in complete satisfaction, discharge, and release, effective as of the Confirmation Date (but subject to the occurrence of the Effective Date), of any and all Claims, whether known or unknown, against the Debtor or any of its assets or properties, regardless of whether the property has been distributed or retained pursuant to the Plan. Without limiting the generality of the foregoing, the Debtor will be discharged from any and all Claims and debts of

the kind specified in sections 502(g), 502(h) and 502(i) of the Bankruptcy Code, in each case whether or not (a) a Proof of Claim is filed or deemed filed under section 501 of the Bankruptcy Code, (b) a Claim is allowed under section 502 of the Bankruptcy Code, or (c) the holder of such a Claim accepted the Plan.

### 9.5 Full Release of PNC Bank, as Agent, and the Pre-Petition Lenders.

**Notwithstanding anything contained in the Plan to the contrary, provided that Class 1 votes to accept the Plan, on the Effective Date for the good and valuable consideration provided by PNC Bank, as Agent, and the Pre-Petition Lenders, the Debtor, the Committee, the M&E Trust, and all Persons and Persons holding Claims or Interests in or against the Debtor shall fully discharge and release PNC Bank, as Agent, the Pre-Petition Lenders and their respective agents, employees, receivers, and professionals (including, without limitation, Raintree Capital Partners, LLC (including William Frazier as a member and in his capacity as former receiver of Max & Erma's), Reed Smith LLP, Bailey Cavalieri, LLC and their respective members, employees and representatives) (collectively, the "Lender Released Parties") (and each such Lender Released Party so released shall be deemed released and discharged) from any and all Claims, Causes of Action and any other debts, obligations, rights, suits, damages, actions, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing as of the Effective Date or thereafter arising, in law, at equity, whether for tort, fraud, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction or other occurrence or circumstances (collectively, the "Released Lender Claims") existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtor (the "Full Release").**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Fed. R. Bankr. P. 9019, of the Full Release, which includes by reference each of the related provisions and definitions contained in this Plan, and _further_, shall constitute its finding that the Full Release is: (a) in exchange for the good and valuable consideration provided by the Released Lender Parties, a good faith settlement and compromise of such Claims; (b) in the best interests of the Debtor and all Holders of Interests and Claims; (c) fair, equitable, and reasonable; (d) given and made after due notice and opportunity for hearing; and (e) a bar to any of the Debtor, the Committee, the M&E Trustee, any Holder of a Claim or Interest, or any other Person asserting any Released Lender Claim or any other Claim, cause of action or liability related thereto of any kind whatsoever against any of PNC Bank, as Agent, and the Pre-Petition Lenders.**

### 9.6 Exculpation.

Notwithstanding anything contained in the Plan to the contrary, the Exculpated Parties shall neither have, nor incur any liability to any Person for any prepetition or postpetition act taken or omitted to be taken in connection with, or related to formulating, negotiating, preparing, disseminating, implementing, administering the Plan, any of the Sale Documents or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan, or other pre- or post-petition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Company or confirming or consummating the Plan; _provided_, _however_, that the foregoing provisions of this Article shall have no effect on the

liability of any Person that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct, and, *provided*, *further*, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her or its duties to, or in connection with, the Plan and the Sale Documents.

### 9.7 Preservation of Rights of Action.

#### (a) Maintenance of Causes of Action

Except as otherwise provided in the Plan, after the Effective Date the M&E Trust, as successor to the Debtor and/or the Committee, shall retain all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, in any court or other tribunal including, without limitation, in an adversary proceeding filed. Except as otherwise provided in the Plan, in accordance with section 1123(b)(3) of the Bankruptcy Code, any other Claims, rights, and Causes of Action in that the Debtor may hold against any Entity or Person shall vest upon the Effective Date in the M&E Trust. The M&E Trust through the M&E Trustee, will receive, be vested with and may exclusively enforce any and all such claims, rights, or Causes of Action. After the Effective Date, the M&E Trust shall have the exclusive right, authority, and discretion to institute, prosecute, abandon, settle or compromise any and all such claims, rights, and Causes of Action without the consent or approval of any third party and without further order of the Bankruptcy Court, except as otherwise provided in the Plan.

#### (b) Preservation of All Causes of Action Not Expressly Settled or Released

Unless a Claim or Cause of Action against a Person or Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order, all such Claims or Causes of Action are expressly reserved for the M&E Trust and its Beneficiaries for later adjudication by the M&E Trust (including, without limitation, Claims and Causes of Action not specifically identified or which the Debtor or Committee may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtor or Committee at the time or facts or circumstances which may change or be different from those which the Debtor and Committee now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise) or laches shall apply to such Claims or Causes of Action upon or after the Confirmation or Consummation of the Plan based on the Sale Documents (including without limitation, the Disclosure Statement), except where such Claims or Causes of Action have been released in the Plan. In addition, rights are expressly reserved for the M&E Trustee as of the Effective Date and thereafter, to pursue or adopt any claims alleged in any lawsuit in which the Debtor is a defendant or an interested party, against any person or entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

### 9.8 Injunction.

#### (a) From and after the Effective Date, all Persons and Entities are permanently enjoined from commencing or continuing in any manner against the Debtor, the M&E Trust, the Lender Released Parties, their successors and assigns, and

their assets and properties, as the case may be, any suit, action or other proceeding, on account of or respecting any Claim, demand, liability, obligation, debt right, Cause of Action, interest or remedy released or to be released pursuant to the Plan or the Confirmation Order.

(b)  From and after the Effective Date, all Persons and Entities shall be precluded from asserting against the Debtor, its Estate, the M&E Trust, the Lender Released Parties, their successors and assigns, and their assets and properties, any other Claims or Equity Interests based upon any documents, instruments, or any act or omission transaction or other activity of any kind or nature that occurred prior to the Effective Date.

(c)  The rights afforded in the Plan and treatment of Claims and Equity Interests in the Plan shall be in exchange for and in complete satisfaction and release of Claims and Equity Interests of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, against the Debtor and any of its assets or properties.  On the Effective Date, all such claims against, and Equity Interest in the Debtor shall be satisfied and released in full, unless as otherwise provided in the Plan.

(d)  Except as otherwise expressly provided in the Plan or in obligations issued pursuant to the Plan, all Parties and Entities are permanently enjoined from and after the Effective Date, on account of any Claim or Equity Interest satisfied and released hereby from:

(i)  Commencing or continuing in any manner, any action or other proceeding of any kind against the Debtor or Committee, after the Effective Date, against the M&E Trust, their successors and assigns and their assets and properties;

(ii)  Enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against the Debtor or, after the Effective Date, against the M&E Trust, its successors and assigns, and their assets and properties;

(iii)  Creating, perfecting, or enforcing any encumbrance of any kind against the Debtor, or after the Effective Date, against the M&E Trust or the property or Estate of the Debtor, or after the Effective Date, of the M&E Trust;

(iv)  Asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from the Debtor or after the Effective Date against the M&E Trust, or against the property or Estate of the Debtor or after the Effective Date, of the M&E Trust with respect to any such Claim or Equity Interest; or

(v)  Commencing or continuing in any manner any action or other proceeding of any kind in respect of any Claim or Cause of Action released or settled hereunder.

**9.9  Purchaser Not a Successor.**

Except for those liabilities and obligations specifically assumed pursuant to the Sale Documents, Purchaser shall not be deemed to be liable to any party, known or unknown, under

any theory of successor liability including, without limitation, "Implied Assumption," "Defacto Merger," "Continuation of Enterprise," "Fraudulent Transfer" or "Product Line Exception".

## **ARTICLE X - RETENTION OF JURISDICTION**

### 10.1    **Jurisdiction by the Bankruptcy Court.**

The Bankruptcy Court will retain jurisdiction of all matters arising under, arising out of, or related to the Case and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

(a)    To hear and determine motions for the assumption, assumption and assignment or rejection of executory contracts or unexpired leases and the allowance of Claims resulting therefrom;

(b)    To determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date, or any other Cause of Action;

(c)    To ensure that distributions to holders of Allowed Claims are accomplished as provided herein;

(d)    To consider Claims or the allowance, classification, priority, compromise, estimation or payment of any Claim;

(e)    To enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated;

(f)    To issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any person with the consummation, implementation or enforcement of the Plan, the Confirmation Order or any other order of the Bankruptcy Court;

(g)    To hear and determine any application to modify the Sale Documents in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Sale Documents, the Disclosure Statement or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(h)    To hear and determine all applications under sections 328, 330, 331 and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred by Professionals;

(i)    To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, any transactions or payments contemplated hereby, or any agreement, instrument, or other document governing or relating to any of the foregoing;

(j)      To hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the M&E Trust Agreement, and to hear and determine all matters involving or relating to the M&E Trust or the M&E Trustee;

(k)      To take any action and issue such orders as may be necessary to construe, enforce, implement, execute and consummate the Plan or to maintain the integrity of the Plan following consummation;

(l)      To recover all property of the Estate, wherever located, which jurisdiction shall not be limited as a result of the transfer of any such assets and property to the M&E Trust pursuant to the Plan;

(m)      To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(n)      To hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including, without limitation, matters with respect to any taxes payable by a trust or reserve established in furtherance of the Plan);

(o)      To hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code; and

(p)      To enter a final decree closing the Case.

## ARTICLE XI - CRAMDOWN RESERVATION

### 11.1    Nonconsensual Confirmation.

The Plan Proponents reserve the right to undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code and/or amend the Plan in accordance with section 13.4 of the Plan to the extent necessary to obtain entry of the Confirmation Order.

## ARTICLE XII - MISCELLANEOUS PROVISIONS

### 12.1    Disposition of the Creditors Committee.

The Committee will disband and be released of its duties and obligations on the Effective Date.

### 12.2    Substantial Consummation.

On the Effective Date, the Plan will be deemed to be "substantially consummated" as contemplated under sections 1101 and 1127(b) of the Bankruptcy Code.

### 12.3    Payment of Statutory Fees.

On the Effective Date, (or as soon thereafter as is reasonably practicable) and thereafter as may be required, the M&E Trustee will pay all fees payable pursuant to section 1930 of chapter 123 of title 28 of the United States Code.  These fees are Retained Administrative Expense Claims.

### 12.4    Modification of Sale Documents.

The Sale Documents and any Ancillary Agreements may be amended, modified, or supplemented by the Plan Proponents (and to the extent that such amendments, modifications or supplements may adversely affect the Pre Petition Bank Debt or its treatment under the Plan with the express written consent of the Agent) with the express written consent of Purchaser, in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as the Bankruptcy Court may otherwise direct. In addition, after the Confirmation Date, so long as such action does not materially adversely affect the treatment of holders of Claims or Equity Interests under the Plan, the Plan Proponents may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of the Plan.  Prior to the Effective Date, the Plan Proponents, with the express written consent of Purchaser (and to the extent that such amendments, modifications or supplements may adversely affect the Pre Petition Bank Debt or its treatment under the Plan with the express written consent of the Agent), may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court, provided that such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or Equity Interests.

### 12.5    Modification of the Plan.

The Plan may be amended, modified, or supplemented by the Plan Proponents in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as the Bankruptcy Court may otherwise direct. In addition, after the Confirmation Date, so long as such action does not materially adversely affect the treatment of holders of Claims or Equity Interests under the Plan, the Plan Proponents may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of the Plan.  Prior to the Effective Date, the Plan Proponents may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court, *provided* that such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or Equity Interests.

### 12.6    Revocation or Withdrawal of Plan.

The Plan Proponents reserve the right to revoke or withdraw the Plan at any time prior to the Confirmation Date.  If the Plan Proponents take such action, the Plan will be deemed null and void. In such event, nothing in the Plan will be deemed to constitute a waiver or release of any

Claim by or against the Debtor or any other person or to prejudice in any manner the rights of the Debtor or any other person in any further proceedings involving the Debtor.

### 12.7   Fiduciary Obligations of Plan Proponents.

Notwithstanding anything to the contrary contained in the Plan or the Sale Documents, the obligations of the respective Plan Proponents under the Plan with respect to the Purchaser are subject at all times to the fulfillment of the respective fiduciary duties of the Plan Proponents. Although the Plan Proponents have agreed with Purchaser to cease actively marketing the Acquired Assets for sale, the Plan Proponents, subject to the provisions of the Break-Up Fee Order, if applicable, may, prior to entry of the Confirmation Order, undertake subject to Bankruptcy Court approval, an Alternative Transaction in the event that the Sale Documents are no longer in the best interests of the Debtor's Estate and creditors and the Sale Documents would be inconsistent with the fiduciary duties of the Debtor and Committee, respectively, as Plan Proponents.

### 12.8   Courts of Competent Jurisdiction.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal, or failure of jurisdiction will have no effect upon and will not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

### 12.9   Severability.

If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtor, will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, Impaired, or invalidated by such holding, alteration or interpretation. The Confirmation Order will constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### 12.10   Governing Law.

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto provides otherwise, the rights, duties and obligations arising under the Plan will be governed by, and construed and enforced in accordance with, the laws of the Commonwealth of Pennsylvania, without giving effect to the principles of conflicts of law thereof.

### 12.11  Successors and Assigns.

All the rights, benefits and obligations of any Person named or referred to in the Plan shall be binding on, and will inure to the benefit of, the heirs, executors, administrators, successors and/or assigns of such Person.

### 12.12  Time.

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

## ARTICLE XIII - UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS

### 13.1  Introduction

The following discussion summarizes certain material United States federal income tax ("Federal Income Tax") consequences of the Plan to certain holders of Allowed Claims (the "Creditors") and the Debtor.  This discussion does not address the Federal Income Tax consequences to: (i) Creditors whose claims are entitled to payment in full in cash, or are otherwise unimpaired under the Plan; and (ii) holders of equity interests or claims that are extinguished without a distribution.  This discussion is based upon existing provisions of the Tax Code, Treasury regulations promulgated thereunder, judicial authorities and current administrative rulings and practices now in effect.  No assurance can be given that future legislation, regulations, administrative pronouncements and/or judicial decisions will not change applicable law and affect the analysis described herein.  Any such change could be applied retroactively in a manner that would adversely affect the creditors and the Debtor.

The Federal Income Tax consequences of certain aspects of the Plan are uncertain due to the lack of applicable legal authority and may be subject to administrative or judicial interpretations that differ from the discussion below.  The Plan Proponents have not sought and will not seek any rulings from the Internal Revenue Service ("IRS") with respect to the Federal Income Tax consequences discussed below.  Although the discussion below represents the best judgment as to the matters discussed herein, it does not in any way bind the IRS or the courts or in any way constitute an assurance that the Federal Income Tax consequences discussed herein will be accepted by the IRS or the courts.

The following discussion does not address state, local or foreign tax considerations that may be applicable to the Debtor or Creditors and the discussion does not address the tax consequences of the Plan to certain types of Creditors (including foreign persons, financial institutions, life insurance companies, tax-exempt organizations and taxpayers who may be subject to the alternative minimum tax) who may be subject to special rules not addressed herein.

THE FOLLOWING SUMMARY OF CERTAIN MATERIAL FEDERAL INCOME TAX CONSEQUENCES IS FOR GENERAL INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF AN ALLOWED CLAIM OR EQUITY INTEREST.  THE PLAN PROPONENTS ARE NOT MAKING ANY

REPRESENTATIONS REGARDING THE PARTICULAR TAX CONSEQUENCES OF CONFIRMATION AND CONSUMMATION OF THE PLAN WITH RESPECT TO THE DEBTOR OR THE HOLDERS OF ANY CLAIMS OR EQUITY INTERESTS, NOR ARE THE PLAN PROPONENTS RENDERING ANY FORM OF LEGAL OPINION OR TAX ADVICE ON SUCH TAX CONSEQUENCES. ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS ARE ADVISED TO CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE FEDERAL, STATE, LOCAL, FOREIGN AND OTHER TAX CONSEQUENCES OF THE IMPLEMENTATION OF THE PLAN IN GENERAL AND IN PARTICULAR, THE TIMING, CHARACTER AND AMOUNTS OF INCOME, GAIN, LOSS, DEDUCTION, CREDIT OR CREDIT RECAPTURE TO BE RECOGNIZED, AND ANY PROCEDURAL REQUIREMENTS WITH WHICH THE HOLDER MUST COMPLY.

### 13.2 Certain Material United States Federal Income Tax Consequences to Holders of Claims

(a) <u>General</u>

The tax treatment of holders of Claims and the character and amount of income, gain or loss recognized as a consequence of the Plan and the distributions provided for by the Plan will depend upon, among other things, (i) whether the Claim (or any portion thereof) constitutes a Claim for principal or interest; (ii) the type and classification of consideration received by the holder in exchange for the Claim; (iii) whether the holder is a resident of the United States for tax purposes (or falls into any special class of taxpayers, such as those that are excluded from this discussion as noted above); (iv) the manner in which a holder acquired a Claim; (v) the length of time the Claim has been held; (vi) whether the claim was acquired at a discount; (vii) whether the holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (viii) whether the holder has previously included accrued but unpaid interest with respect to the Claim; (ix) the method of tax accounting of the holder; (x) whether the claim is an installment obligation for United States federal income tax purposes; and (xi) whether the "market discount" rules are applicable to the holder. Therefore, holders of Claims should consult their tax advisors for information that may be relevant to their particular situation and circumstances and the particular tax consequences to them of the transactions contemplated by the Plan.

A holder of a Claim should generally recognize a gain (or loss) to the extent that the amount realized under the Plan in respect of the Claim exceeds (or is exceeded by) the holder's tax basis in the Claim. The holder's amount realized for this purpose will generally equal the amount of Cash the holder receives under the Plan in respect of its Claim. The timing and amount of income, gain or loss recognized as a consequence provided for by the Plan will depend on, among other things, whether the holder of a Claim receives multiple distributions pursuant to the Plan and whether the Debtor's or M&E Trustee's obligation to make such payments is treated as a new debt for United States federal income tax purposes. Gain or loss may not currently be recognized if the property received does not have an ascertainable fair market value.

(b) <u>Accrued But Untaxed Interest</u>

A portion of the consideration (whether cash, stock, debt or other consideration) received by Holders of Claims and Interest may be attributable to accrued but untaxed interest on such Claims. Such amount should be taxable to that Holder as interest income if such accrued interest has not been previously included in the Holder's gross income for U.S. federal income tax purposes. Conversely, a Holder generally recognizes a deductible loss to the extent any accrues interest claimed was previously included in income and is not paid in full.

If the fair value of the consideration received by Holders of Claims and Interests is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such consideration will be attributable to accrued but untaxed interest is unclear. Holders of Claims and Interest should consult their tax advisors regarding the proper allocation of the consideration received by them under the Plan.

(c)     Market Discount

The market discount provisions of the Internal Revenue Code of 1986 (the "Tax Code") may apply to holders of certain Claims. In general, a debt obligation other than a debt obligation with a fixed maturity of one year or less that is acquired by a holder in the secondary market (or, in certain circumstances, upon original issuance) is a "market discount bond" as to that holder if its stated redemption price at maturity (or, in the case of a debt obligation having original issue discount, its revised issue price) exceeds the tax basis of the debt obligation will not be a "market discount bond" if such excess is less than a statutory *de minimis* amount. Gain recognized by the holder of a Claim with respect to a "market discount bond" will generally be treated as ordinary interest income to the extent of the market discount accrued on such bond during the holder's grace period of ownership, unless the holder elected to include accrued market discount in taxable income currently. A holder of a market discount bond that is required under the market discount rules of the Tax Code to defer deduction of all or a portion of the interest on indebtedness incurred or maintained to acquire or carry the bond may be allowed to deduct such interest, in whole or in part, on disposition of such bond.

(d)     Information Reporting and Backup Withholding

Certain payments, including the payments with respect to Claims pursuant to the Plan, are generally subject to information reporting by the payor (the Debtor or the M&E Trustee, as applicable) to the IRS. Moreover, such reportable payments are subject to backup withholding under certain circumstances. Under the Tax Code's backup withholding rules, a holder of a Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan, unless the holder: (1) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact, or (2) provides a correct United States taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income.

Holders of Claims that are non-United States Persons and that receive payments or distributions under the Plan will not be subject to backup withholding, provided that such holders furnish certification of their status as non-United States Persons (and furnish any other required certification), or are otherwise exempt from backup withholding. Generally, such certification is provided on IRS Form W-8BEN.

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a holder's United States federal income tax liability and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a United States federal income tax return).

PERSONS CONCERNED WITH THE TAX CONSEQUENCES OF THE PLAN SHOULD CONSULT THEIR OWN ACCOUNTANTS, ATTORNEYS AND/OR ADVISORS. THE PLAN PROPONENTS MAKE THE ABOVE-NOTED DISCLOSURE OF POSSIBLE TAX CONSEQUENCES FOR THE SOLE PURPOSE OF ALERTING READERS TO TAX ISSUES THEY MAY WISH TO CONSIDER.

## ARTICLE XIV - ALTERNATIVES TO THE PLAN

### 14.1    Other Chapter 11 Plans.

If the Plan is not confirmed, the Debtor or any other party in interest (if the Debtor's exclusive period in which to file a chapter 11 plan has expired) could attempt to formulate an alternative chapter 11 plan that might provide for the disposition of the Debtor's assets other than as provided in the Plan. However, the Plan Proponents submits that any alternative chapter 11 plan will not provide a greater return to impaired creditors than the Plan. Any attempt to formulate an alternative chapter 11 plan would necessarily delay creditors' receipt of distributions and is highly unlikely to formulate a methodology to create greater value (return) to impaired creditors than the Plan. Accordingly, the Plan Proponents submit that the Plan will enable all creditors entitled to distributions to realize the greatest possible recovery on their respective Claims with the least possible delay.

### 14.2    Liquidation under Chapter 7 of the Bankruptcy Code.

If the Plan or any alternative chapter 11 plan cannot be confirmed under section 1129(a) of the Bankruptcy Code, the Case may be converted to a case under chapter 7 of the Bankruptcy Code, in which event a trustee would be appointed (or subsequently elected) to liquidate any remaining assets of the Debtor for distribution to creditors pursuant to chapter 7 of the Bankruptcy Code. If a trustee is appointed and the assets of the Debtor are liquidated under chapter 7 of the Bankruptcy Code, creditors would likely receive distributions of a lesser value on account of their Allowed Claims. A chapter 7 trustee would be required to invest substantial time and resources to investigate the facts underlying the multitude of Claims filed against the Estate and Causes of Action, thereby substantially increasing both costs and time necessary to fully administer the Estate. Likewise, in addition to fees of professionals retained by a chapter 7 trustee, the chapter 7 trustee would also charge a fee tied to the value of all assets administered by the chapter 7 trustee in accordance with section 326(a) of the Bankruptcy Code.

### 14.3    Dismissal of the Chapter 11 Case.

If the Case was dismissed, Carlisle might foreclose upon its Lien(s) on the Debtor's property, the result being that secured creditors would receive liquidation value rather than fair market value, and unsecured creditors would not obtain any recovery. Therefore, the Plan

Proponents submit that dismissal of this Case is not an attractive or superior alternative to the Plan, and the Plan represents the best alternative for maximizing the return to all Creditors.

## ARTICLE XV - CONFIRMATION REQUIREMENTS

### 15.1  Acceptances Necessary to Confirm the Plan.

At the Consolidated Confirmation Hearing, the Bankruptcy Court must determine, among other things, whether the Plan has been accepted by the requisite amount and number of Allowed Claims in each impaired class.  Under the Bankruptcy Code, a class of creditors or equity security holders is impaired if its legal, equitable or contractual rights are altered by a proposed plan of reorganization.  If a class is not impaired, each creditor or equity security holder in such unimpaired class is conclusively presumed to have accepted the plan pursuant to section 1126(f) of the Bankruptcy Code.  Classes 3 and 4 are not impaired under the Plan and are, therefore, not entitled to vote on the Plan.  Classes 1, 2 and 5 are impaired under the Plan and holders of Allowed Claims in such classes are entitled to vote for or against the Plan by completing and returning the Ballots mailed to them with this Disclosure Statement in the manner set forth in the Ballots.  Classes 6 and 7 are impaired under the Plan, but are deemed to reject the Plan, and are not entitled to vote on the Plan.

An impaired class of creditors and each holder of a claim in such class will be deemed to have accepted the Plan if the holders of at least two-thirds in amount and more than one-half of those in number of the Allowed Claims in such impaired class for which complete and timely Ballots have been received have voted for acceptance of the Plan.

Because the subordinated claims held by the members of Class 6 and the equity interests held by the members of Class 7 are eliminated entirely under the Plan, Classes 6 and 7 are deemed to have rejected the Plan, and the Debtor cannot satisfy the requirements of section 1129(a)(8) of the Bankruptcy Code.  Accordingly, the Plan Proponents intend to seek confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code.  Under section 1129(b), the Bankruptcy Court must determine, among other things, that the Plan does not discriminate unfairly and that it is fair and equitable with respect to each class of impaired Allowed Claims and Equity Interests that have not voted to accept the Plan.

### 15.2  Best Interests of Creditors.

The Bankruptcy Code requires that each holder of an impaired claim or equity interest either (i) accept the Plan, or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code.

The first step in determining whether this test has been satisfied is to determine the dollar amount that would be generated from the liquidation of the Debtor's assets and properties in the context of a chapter 7 liquidation case.  The gross amount of cash that would be available for satisfaction of claims and equity interests would be the sum consisting of the proceeds resulting from the disposition of the unencumbered assets and properties of the Debtor.

The next step is to reduce that gross amount by the costs and expenses of liquidation and by such additional administrative and priority claims that might result from the use of chapter 7 for the purposes of liquidation. Any remaining net cash would be allocated to creditors and shareholders in strict priority in accordance with section 726 of the Bankruptcy Code. Finally, the present value of such allocations (taking into account the time necessary to accomplish the liquidation) is compared to the value of the property that is proposed to be distributed under the Plan on the Effective Date.

The Debtor's costs of liquidation under chapter 7 would include the fees payable to a trustee in bankruptcy, as well as those fees that might be payable to attorneys and other professionals that such a trustee might engage. Other liquidation costs include the expenses incurred during the Case and subsequently allowed in the chapter 7 cases, such as compensation for attorneys, financial advisors, appraisers, accountants and other professionals.

The foregoing types of claims, costs, expenses, fees and such other claims that may arise in a liquidation case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay pre-petition priority and non-priority Claims in the Chapter 11 case.

As described in more detail in the Liquidation Analysis attached hereto as Exhibit B, the Plan Proponents submit that each Impaired Class will receive under the Plan a recovery at least equal in value to the recovery such Class would receive pursuant to a liquidation of the Debtor under chapter 7 of the Bankruptcy Code. The Debtor also submits that the value of any distributions to each Secured Creditor in a Chapter 7 liquidation would be less than the value of distributions under the Plan and such distributions in a chapter 7 case would not occur for a substantial period of time.

### 15.3 Feasibility.

Section 1129(a)(11) of the Bankruptcy Code provides that a chapter 11 plan may be confirmed only if the Court finds that such plan is feasible. A feasible plan is one which will not lead to a need for further reorganization or liquidation of the debtor. The Plan Proponents submit that the Plan satisfies the financial feasibility requirement imposed by the Bankruptcy Code.

### 15.4 Confirmation of the Plan.

In the event the Bankruptcy Court determines that all of the requirements for the confirmation of the Plan are satisfied, the Bankruptcy Court will issue the Confirmation Order confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

### ARTICLE XVI - CERTAIN RISK FACTORS TO BE CONSIDERED

HOLDERS OF IMPAIRED CLAIMS AGAINST OR INTERESTS IN THE DEBTOR ARE ENCOURAGED TO READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THOSE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS

CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

### 16.1    Parties in Interest May Object to the Plan Proponents' Classification of Claims.

Section 1122 of the Bankruptcy Code provides that a plan of reorganization may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.  The Plan Proponents submit that the classification of claims and interests under the Plan complies with the requirements set forth in the Bankruptcy Code.  However, the Plan Proponents cannot give assurances that the Bankruptcy Court will reach the same conclusion.

### 16.2    The Plan Proponents May Not Be Able to Secure Confirmation of the Plan.

The Plan Proponents cannot assure you that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, the Plan Proponents cannot assure you that the Bankruptcy Court will confirm the Plan.  A non-accepting creditor of the Debtor might challenge the balloting procedures and results as not being in compliance with the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determined that the Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met.  Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, (a) a finding by the Bankruptcy Court that the confirmation of the Plan is not likely to be followed by a liquidation or a need for further financial reorganization; (b) that the value of distributions to non-accepting holders of claims and interests within a particular class under the Plan will not be less than the value of distributions such holders would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code; and (c) that the Plan does not unfairly discriminate and is fair and equitable with respect to any non-accepting Classes.  While the Plan Proponents cannot give assurances that the Bankruptcy Court will conclude that these requirements have been met, the Plan Proponents submit that the Plan will not be followed by a need for further financial reorganization and that non-accepting holders within each class under the Plan will receive distributions at least as great as would be received following a liquidation under chapter 7 of the Bankruptcy Code.

### 16.3    The Plan Proponents May Object to the Amount or Classification of Your Claim.

The Plan Proponents reserve the right to object to the amount or classification of any claim.  The estimates set forth in this Disclosure Statement cannot be relied on by any creditor whose claim is subject to an objection.  Any such creditor may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 16.4    The Sale to the Purchaser May Not Be Approved as Proposed.

It is possible that the sale of the Debtor's assets as proposed in the Plan may not be approved.  To the extent the sale to the Purchaser does not close as proposed in the Plan or any

of the conditions precedent to closing of the sale are not satisfied, the Plan may be at risk because the Plan is based on a compromise by various interested parties whose concessions are based on approval of the Plan as proposed.

## **ARTICLE XVII - WHERE YOU CAN OBTAIN MORE INFORMATION**

Pursuant to the requirements of the Office of the United States Trustee, the Debtor is required to and have filed monthly operating reports for the postpetition period with the Bankruptcy Court. These monthly operating reports may be obtained at prescribed per page copy rates by writing to the Office of the Clerk of the United States Bankruptcy Court for the Western District of Pennsylvania, 5414 U.S. Steel Tower, 600 Grant Street, Pittsburgh, PA 15219; telephone (412) 644-2700, or on-line at the Bankruptcy Court's website: http://www.pawb.uscourts.gov (PACER-CM/ECF account required for on-line viewing of documents).

*[Remainder of this page intentionally left blank]*

## ARTICLE XVIII - CONCLUSION AND RECOMMENDATION

The Plan Proponents believe that confirmation and implementation of the Plan is preferable to any of the alternatives described above because it will provide the greatest recoveries to holders of Claims. The Plan Proponents urge holders of Claims entitled to vote on the Plan to vote to accept the Plan.

Dated: July 9, 2010                                 MAX & ERMA'S RESTAURANT, INC.


By:   /s/ Mark A. Roberts
Name:  Mark A. Roberts
Title:   Chief Restructuring Officer
         Chief Executive Officer

                        -and-


OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF MAX & ERMA'S
RESTAURANT, INC.


By:   /s/ William Kaye
Name:  William Kaye
Title:   Committee Co-Chair


12914647.2

# EXHIBIT "A"

Plan of Reorganization

# EXHIBIT "B"

Liquidation Analysis