# UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re: | Case No. 09-27807-MBM |
| MAX & ERMA'S RESTAURANT, INC., | Chapter 11 |
| Debtor. | |

## JOINT MOTION FOR ENTRY OF AN ORDER (I) APPROVING BIDDING PROCEDURES FOR SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS; (II) SCHEDULING A HEARING TO CONSIDER THE𝑓 SALE AND APPROVING THE MANNER OF NOTICES; (III) APPROVING CERTAIN BID PROTECTIONS; AND (IV) ESTABLISHING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Max & Erma's Restaurant, Inc. ("Max & Erma's" or the "Debtor") and the Official Committee of Unsecured Creditors (the "Committee" together with the Debtor, the "Movants") file this motion (the "Motion")[1] for entry of an order (the "Sale Procedures Order") (i) establishing bidding procedures (the "Procedures") in connection with the sale (the "Proposed Sale") of substantially all of the Debtor's assets (as defined in greater detail below, the "Assets"), free and clear of all claims (as defined in 11 U.S.C. § 101(5)) and any interests, liens, mortgages, pledges, security interests, rights of first refusal, obligations and encumbrances of any kind whatsoever (collectively, the "Interests"), except to the extent identified in a Successful Bidder's (defined below) asset purchase agreement; (ii) approving the proposed bid protections (the "Bid Protections") to Concept Development Partners LLC ("Purchaser") in accordance with that certain Asset Purchase Agreement dated July 2, 2010 (the "Agreement"); and (iii) establishing procedures for assumption and assignment of certain executory contracts and unexpired leases

---

[1] Capitalized terms not otherwise defined in this Motion shall have the meaning ascribed to them in the Joint Chapter 11 Plan Dated July 9, 2010 and the exhibits attached thereto.

(the "<u>Assumption and Assignment Procedures</u>"), including notice of proposed cure amounts and approving the form and manner of notice with respect thereto (the "<u>Cure Amount Notice</u>").

Contemporaneously with the filing of this Motion, the Movants filed the Joint Chapter 11 Plan Dated July 9, 2010 (the "<u>Plan</u>"), which incorporates the Agreement therein. Pursuant to the Plan, the Debtor proposes to sell its assets in accordance with the Agreement as the primary source of funds for distributions to be made under the Plan. <u>See</u> Plan at § 6.1(b). By this Motion, the Movants seek to establish the bid procedures, bid protections and other necessary protocols to effectuate the Proposed Sale in connection with the Plan. In support of this Motion, the Movants respectfully represent as follows:

## I. <u>JURISDICTION AND VENUE</u>

1. This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of this Case and this Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The statutory predicates for the relief requested herein are 11 U.S.C. §§ 105, 363, and 365, and Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>").

## II. <u>BACKGROUND</u>

**A.      General Background**

3. On October 23, 2009 (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition for relief under chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 – 1532 (as amended, the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the Western District of Pennsylvania (the "<u>Bankruptcy Court</u>").

4.    The Debtor continues to operate its business and manage its affairs in accordance with the CRO Order (defined below).  No trustee or examiner has been appointed in this chapter 11 case (the "Case").

5.    On November 20, 2009, the Office of the United States Trustee filed its Notice of Appointment of Committee Unsecured Creditors and appointed seven (7) members to serve on the Committee and to represent the interests of all general unsecured creditors of Max & Erma's. The seven (7) members are: (i) Friedberg Milstein Private Capital Fund I; (ii) The Coca-Cola Company; (iii) Matrix Media Services, Inc.; (iv) Monroe Mechanical, Inc.; (v) Facilitec USA, Inc.; (vi) McQ Clean, LLC; and (vii) Cornerstone Max Pickerington, LLC.  William Kaye of JLL Consultants, Inc. and Robert Zable (replaced by James Roche) of GSO/Blackstone Debt Funds Management, LLC serve as the co-chairmen of the Committee.

6.    On December 28, 2009, the Committee and the Pre-Petition Lenders (defined below) filed a Joint Motion for the Appointment of a Chapter 11 Trustee or in the Alternative Termination of the Exclusive Period to File a Chapter 11 Plan (the "Trustee Motion") (Doc. No. 209).  Subsequent to the filing of the Trustee Motion, the Committee, the Pre-Petition Lenders (defined below) and the Debtor submitted to the Bankruptcy Court a proposed Stipulation and Consent Order Authorizing and Directing the Debtor to Retain a Chief Restructuring Officer, which was entered by the Bankruptcy Court on January 15, 2010 (the "CRO Order") (Docket No. 272).  The CRO Order effectively resolved the Trustee Motion.  Pursuant to the CRO Order, Mark A. Roberts of the firm of Alvarez & Marsal North America LLC ("A&M") was retained to act as chief restructuring officer and chief excecutive officer of Max & Erma's.  Currently, A&M and Mr. Roberts are responsible for the day-to-day operations of the Debtor.

**B.    Events Leading to Chapter 11 Filing**

7.     Prior to April 2008, Max & Erma's was a publically-traded company (NASDAQ:MAXE). On April 28, 2008, Max & Erma's entered into an Agreement and Plan of Merger (the "Merger Agreement") with G&R Acquisition, Inc. ("G&R Acquisition") and G&R Acquisition Subsidiary, Inc., a wholly-owned subsidiary of G&R Acquisition ("G&R Subsidiary). Under the Merger Agreement, G&R Subsidiary was merged with and into Max & Erma's (the "Merger"), with Max & Erma's continuing after the Merger as the surviving corporation and a subsidiary of G&R Acquisition.

8.     At the effective time of the Merger, each issued and outstanding share of the Company's common stock (the "Common Stock") was converted into the right to receive $4.00 in cash, without interest (the "Merger Consideration"). In addition, each holder of a vested option to purchase shares of Common Stock were entitled to receive a per share cash payment equal to the amount by which the Merger Consideration exceeded the exercise price of such option (if any), less any applicable withholding taxes.

9.     In September and October of 2009, PNC Bank, National Association, successor by merger to National City Bank, The Huntington Bank and Park National Bank (the "Pre-Petition Lenders") obtained judgments totaling approximately $15.9 million against Max & Erma's, G&R Acquisition and Damon's International, Inc. (a guarantor of the Pre-Petition Bank Debt).

10.    On October 21, 2009, the Franklin County Court of Common Pleas in Columbus, Ohio ordered the appointment of a receiver to manage the affairs of Max & Erma's and Cohen Capital Advisors LLC, a Cleveland, Ohio based consulting firm was appointed receiver. Two

days after the appointment of the receiver, on October 23, 2009, Max & Erma's filed for bankruptcy protection in the Bankruptcy Court.

**C. The Debtor's Marketing and Sale Efforts**

11. On February 9, 2010, the Debtor filed its Application for an Order Pursuant to Sections 327(a) and 328(a) of the Bankruptcy Code Authorizing the Retention of William Blair & Debtor, L.L.C. ("William Blair") as Investment Banker *Nunc Pro Tunc* to February 1, 2010 (the "William Blair Application") (Docket No. 343). The William Blair Application was approved by order of this Court dated March 3, 2010 (Docket No. 418).

12. Pursuant to the William Blair Application and the order approving the same, William Blair was retained by the Debtor to, among other things, market the Debtor's assets for sale and identify a potential plan sponsor.

13. Since being engaged, William Blair worked with the Debtor and A&M to assemble a comprehensive electronic data room for interested parties. William Blair contacted approximately 180 potential financial buyers and 49 potential strategic advisors regarding the Max & Erma's opportunity. Approximately 58 of the parties contacted by William Blair executed confidentiality agreements and received the offering memorandum prepared by William Blair.

14. As a result of the process undertaken by William Blair, seven letters of intent were received by the Debtor from interested parties – four from proposed financial buyers and three from proposed strategic purchasers. The Debtor, its representatives and the Committee, actively negotiated letters of intent with three alternative potential purchasers. Essentially, an out of court auction was conducted by the Debtor and the Committee with these three parties.

15.     At the conclusion of the negotiation process, the Debtor (through the CRO and in consultation with William Blair) and Committee determined that the offer from the Purchaser (Concept Development Partners, LLC) was in the best interest of the Debtor, its bankruptcy estate and creditors.   As a result of this determination, on May 10, 2010, the Debtor and Committee executed a letter of intent (the "Letter of Intent") with the Purchaser.  The Letter of Intent was amended and superceded by a revised letter of intent dated June 10, 2010.   The Debtor and the Committee thereafter began negotiating definitive documentation which has resulted in the Plan, the Agreement and related sale documents pending before the Court for approval.

**D.     The Agreement**

16.     Purchaser and the Debtor executed the Agreement, subject to the process set forth in this Motion.  A copy of the Agreement is attached hereto as Exhibit A.  A summary of the principal terms of the Agreement are as follows:[2]

- Acquired Assets.  Purchaser will acquire all of the tangible and intangible assets of the Debtor, other than Excluded Assets (as defined in the Agreement) free and clear of all liens, claims, interests and other encumbrances, without exception, with respect to the Purchased Stores (as defined in the Agreement).   The acquired assets will include, without limitation, all of the Debtor's cash, credit card rights, accounts receivable, inventory, equipment, prepaid expenses, prepaid taxes, deposits, refund or reimbursement of claims, legal claims related to Acquired Assets, insurance policies and claims, fixed assets, information technology assets (licenses, software and hardware), real property, real property rights, leasehold interests designated by Purchaser, intellectual property and goodwill (collectively, the "Assets")[3].

- Assumption of Liabilities.   Purchaser will assume the following liabilities: (a) all liabilities and obligations of Debtor first arising after the Closing relating to the Acquired Contracts under section 365(k) of the Bankruptcy Code, and the Cure Costs for Acquired

---

[2] This summary is qualified in its entirety by the Agreement.  In the event of any inconsistencies between the provisions of the Agreement and the terms herein, the terms in the Agreement shall govern.

[3] For a more thorough identification of the assets to be acquired by the Purchaser, please refer to Sections 2.1 and 2.2 of the APA.

Contracts in an aggregate amount not to exceed the Cure Costs as reflected in Schedule 2.3 to the Agreement, subject to modification in accordance with Section 2.1(g) of the Agreement; (b) the Seller's pre-petition sales tax liabilities relating to Purchased Stores in the total amount of up to Two Million Five Hundred and Seven Thousand, Nine Hundred and Twenty-Six Dollars ($2,507,926), subject to verification prior to Closing of the amount owed and a provision in the Confirmation Order providing that such sales tax liabilities can be paid by Purchaser ratably over five years from the Closing Date with statutory interest in accordance with Section 1129(a)(9)(C) of the Bankruptcy Code; (c) all Gift Card Claims in an amount not to exceed $2,458,481; and (d) post-petition current accounts payable and post-petition current accrued liabilities that are not Retained Administrative Expense Claims (as defined in the Agreement) and that are incurred and accrued in the ordinary course of business, not more than seven days past due, and described on Schedule 2.3(d) to the Agreement, subject to the Working Capital Adjustment provided for in section 3.3 of the Agreement.

- <u>Purchase Price</u>. Total Consideration, in the form of cash, Assumed Liabilities (as defined in the Agreement) and the M&E Trust Note (as defined in the Agreement) totals $24,854,516 subject to potential decrease based on adjustments provided for under the Agreement. (It is not anticipated, however, that final adjustments under the Agreement will exceed 1% of the Total Consideration.)

- <u>Financing</u>. The Purchaser contemplates up to $12.0 million of the purchase price may be obtained through third party financing; however, there are no financing contingencies under the Agreement.

- <u>Expense Reimbursement</u>. There is no expense reimbursement requirement under the Agreement.

- <u>Break-up Fee</u>. The Agreement requires a break-up fee of $650,000 ("<u>Break-Up Fee</u>") on the closing of an Alternative Transaction (as defined in the Agreement).

- <u>Overbids</u>. The Agreement requires that any Alternative Transaction must exceed the Total Consideration set forth in the Agreement by no less than the sum of the Break-Up Fee ($650,000) plus $200,000 for a total overbid requirement of $850,000.

- <u>Transition Agreement</u>. The Agreement requires the Debtor and Purchaser to enter into a "<u>Transition Agreement</u>" that will enable the Purchaser to operate the Assets after the Closing in the ordinary course of business, including the uninterrupted authority of Purchaser to sell alcoholic beverages.

- <u>Closing</u>. The Agreement requires that closing on the Sale must occur on a Business Day selected by the Purchaser not later than fifteen (15) days after entry of the Confirmation Order.

## III.  RELIEF REQUESTED

17.    By this Motion, the Movants seek entry of the Sale Procedures Order (i) establishing and approving Procedures in connection with the sale of the Assets, free and clear of all Claims and Interests,[4] except to the extent identified in the Agreement, Plan or an asset purchase agreement with respect to an Alternative Transaction;[5] (ii) approving the Bid Protections to Purchaser in accordance with the Agreement; (iii) scheduling the auction, sale hearing and proposed notice; and (iv) establishing the assumption, assignment and cure claim procedures associated with the Proposed Sale.  The relief sought herein is in conjunction with Movants' efforts to ultimately obtain Bankruptcy Court approval of the Proposed Sale under the Plan, which approval shall be memorialized in the Order confirming the Plan.

18.    Purchaser and certain Potential Bidders (defined below) may request information with respect to certain executory contracts and unexpired leases, some of which may contain confidentiality provisions.  Accordingly, by this Motion, notwithstanding the existence of such a confidentiality provision, the Movants also seek authority to provide Potential Bidders a copy of any executory contract or unexpired lease to those who have executed an appropriate confidentiality agreement.

---

[4] "Claim" has the meaning set forth in section 101(5) of the Bankruptcy Code.  "Interest", as defined in the Plan, means any equity security of the Debtor existing immediately prior to the Plan effective date (which is set forth in section 1.35 of the Plan).

[5] "Alternative Transaction", as set forth in the Agreement, means the consummation of any transaction (regardless of the form thereof) involving a sale of all or any substantial portion of the Assets by the Debtor to a purchaser or purchasers other than Purchaser, or a plan of reorganization that does not contemplate the sale of the Assets by Debtor to Purchaser in accordance with the terms of the Agreement.

**A.      The Proposed Procedures, Protections and Auction/Sale Dates**

19.      The Debtor and the Committee have fiduciary obligations, respectively, to maximize the value of the Assets and recoveries to creditors.[6]  While William Blair has undertaken considerable effort to market the Assets since William Blair's retention (as discussed above), in order to confirm that maximum value is received for the Assets, and to assure that the Purchaser moves forward with the proposed transaction, the Debtor and Committee submit that it is important to promptly obtain approval of and implement the Procedures.

20.      The Procedures reflect the Movants' collective objective of assuring in a controlled, but fair and open fashion so that financially-capable, motivated potential purchasers who are likely to close on a transaction can undertake an Alternative Transaction for the Assets.

21.      A summary of the key provisions of the Procedures are as follows; however, this summary is qualified in its entirety by the actual Procedures, a copy of which are attached hereto as Exhibit B:

- Bidding Deadline.  All offers (each a "Bid") must be submitted in writing so that they are actually received no later than ten (10) days prior to the Consolidated Confirmation Hearing (the "Bidding Deadline").  Prior to the Bidding Deadline, a Qualified Bidder (as defined below) that wants to make a Bid shall deliver written copies of its Bid to counsel for the Debtor and counsel for the Purchaser, (collectively, the "Notice Parties"), by the Bidding Deadline.  A Bid received after the Bidding Deadline will not constitute a Qualified Bid (as defined below).  A Bid must be delivered to all Notice Parties at the same time.  Interested bidders requesting information about the qualification process, including a form asset purchase agreement, and information in connection with their due diligence, should contact the Debtor c/o Mark Roberts (Mroberts@alvarezandmarsal.com) and Jeff Knopping of William Blair ((jknopping@williamblair.com).

- Participation Requirements.  To participate in the process detailed by the Procedures and to otherwise be considered for any purpose hereunder, each Bid and each bidder ("Potential Bidder") must be determined by the Debtor and the Committee to have

---

[6] The Agreement does not contemplate competitive bidding or active marketing by the Debtor or William Blair. Instead, the Agreement and the Plan specifically provide the Debtor and Committee with "fiduciary outs" from the Agreement in the event that an Alternative Transaction is available.

satisfactorily provided the Debtor with each of the following on or before the Bidding Deadline (the "Participant Requirements"):

- o *Identification of Potential Bidder.* Identification of the Potential Bidder and any Principals (defined below), and the representatives thereof who are authorized to appear and act on behalf for all purposes regarding the contemplated transaction;

- o *Non-Binding Expression of Interest.* An executed non-binding indication of interest satisfactory to the Debtor and the Committee that must reasonably identify the contemplated transaction, including the assets proposed to be acquired, the proposed purchase price, contingencies and conditions precedent to closing;

- o *Corporate Authority.* Written evidence of the Potential Bidder's chief executive officer or other appropriate senior executive's approval of the contemplated transaction; *provided, however*, that, if the Potential Bidder is an entity specially formed for the purpose of effectuating the contemplated transaction (an "Acquisition Entity"), then the Potential Bidder must furnish written evidence reasonably acceptable to the Debtor and the Committee of the approval of the contemplated transaction by the equity holder(s) of such Potential Bidder (the "Principals");

- o *Confidentiality Agreement.* An executed confidentiality agreement in form and substance acceptable to the Debtor and the Committee and their respective counsel, and in any event a confidentiality agreement substantially similar to that signed by Purchaser; and

- o *Proof of Financial Ability to Perform.* Written evidence upon which the Debtor and the Committee may reasonably conclude, in their collective discretion, that the Potential Bidder has the necessary financial ability to close the contemplated transaction and provide adequate assurance of future performance under all contracts and unexpired leases to be assumed in such contemplated transaction. Such information should include, among other things:

  - ▪ the Potential Bidder's, or in the case of an Acquisition Entity, the Principal's, current financial statements (audited if they exist);

  - ▪ contact names and numbers for verification of financing sources;

  - ▪ evidence of the Potential Bidder's or Principal's internal resources and proof of any debt or equity funding commitments that are needed to close the contemplated transaction; and

  - ▪ any such other form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtor and the Committee, demonstrating that such Potential Bidder has the ability to

close the contemplated transaction; provided, however, that the Debtor and the Committee shall mutually determine, in their reasonable discretion, in consultation with their advisors, whether the written evidence of such financial wherewithal is reasonably acceptable, and shall not unreasonably withhold acceptance of a Potential Bidder's financial qualifications

- Designation as a Qualified Bidder. A "Qualified Bidder" is a Potential Bidder that delivers the documents described above, and that the Debtor and the Committee in their collective discretion and with assistance from their advisors determine is reasonably likely to submit a *bona fide* offer that would result in greater cash value being received for the benefit of the Debtor's creditors than under the Agreement and to be able to consummate a sale if selected as a Successful Bidder (defined below).

  Upon receipt from a Potential Bidder of the information described above, as soon as is practicable, the Debtor and the Committee will collectively determine and notify the Potential Bidder with respect to whether such Potential Bidder is a Qualified Bidder by no later five (5) days prior to the Consolidated Confirmation Hearing.

- Process. The Debtor and the Committee, in consultation with their advisors, will: (i) determine whether a Potential Bidder is a Qualified Bidder; (ii) coordinate the efforts of Bidders in conducting their due diligence investigations, as permitted by the provisions herein; (iii) receive offers from Qualified Bidders; and (iv) negotiate any offers made to purchase the Assets. Subject to the Procedures Order, the Debtor shall have the right, with the approval of the Committee, to adopt such other rules for the Process (including rules that may depart from those set forth herein), that, in their mutual discretion, will better promote the goals of the Process.

- Bidding Requirements. To participate in the Auction, each Bidder and Qualified Bidder submitting a Bid must be determined by the Debtor and the Committee to satisfy each of the following conditions:

  o *Written Submission of Agreement and Commitment to Close.* Qualified Bidders must submit by the Bid Deadline a blackline of the Agreement reflecting their proposed changes, and a written commitment that they intend to close on the terms and conditions set forth therein. Proposed changes to the Agreement are limited to: (i) the name of the purchaser; (ii) the amount of total consideration; (iii) the components of total consideration; (iv) the executory contracts which will be Acquired Contracts; (v) elimination of conditions precedent to closing; and (vi) other provisions which serve to enhance the Agreement;

  o *Irrevocable.* A Bid must be irrevocable until August 31, 2010;

  o *Contingencies.* A Bid may not be conditioned on obtaining financing or any internal approval or on the outcome or review of due diligence. Any other

contingencies associated with a Bid may not be more burdensome than those set forth in the Agreement;

o *Financing Sources*.  A Bid must contain written evidence of a commitment for financing or other evidence of the ability to consummate a sale satisfactory to the Debtor and the Committee, with appropriate contact information for such financing sources;

o *No Fees Payable to Qualified Bidder*.  A Bid may not request or entitle the Qualified Bidder to any break-up fee, topping fee, expense reimbursement or similar type of payment except as set forth herein.  Further, by submitting a Bid, a Bidder shall be deemed to waive its right to pursue a substantial contribution claim under section 503 of the Bankruptcy Code or in any way related to the submission of its Bid or the Bidding Procedures;

o *Good-Faith Deposit*.  Each Bid must be accompanied by a deposit (a "<u>Good-Faith Deposit</u>") in the form of certified checks or cash payable to the order of Max & Erma's Restaurant, Inc. in amount of $400,000, to be held in escrow in accordance with the Bidding Procedures;

o *Minimum Overbid*.  The aggregate consideration proposed by the Bid must equal or exceed the sum of the purchase price provided for in the Agreement, plus the amount of the Break-up Fee, plus $200,000 (the "<u>Initial Minimum Overbid Increment</u>") and shall continue in increments of at least $200,000 (the "<u>Minimum Overbid</u>")

A Bid received from a Qualified Bidder before the Bidding Deadline that meets the above requirements shall constitute a "<u>Qualified Bid</u>" if the Debtor and the Committee believe, in their reasonable discretion, that such Bid would be consummated if selected as the Successful Bid.

For purposes herein, the Agreement shall constitute a Qualified Bid.  All Qualified Bids received prior to the commencement of the Auction (defined below) shall be considered such Qualified Bidder's "<u>Baseline Bid</u>."

If any Potential Bidder is determined by the Debtor and the Committee not to be a Qualified Bidder, the Potential Bidder shall be refunded its Good-Faith Deposit and all accumulated interest thereon within three (3) business days of after such determination.

- <u>Auction</u>.  Only if a Qualified Bid (other than Purchaser's Bid) is received by the Bidding Deadline shall an auction (the "<u>Auction</u>") be held to determine the highest and/or best Bid with respect to the Assets.  The Auction will be conducted two (2) days prior to the Consolidated Confirmation Hearing at the office of counsel for the Debtor, Robert O. Lampl, 960 Penn Avenue, Suite 1200, Pittsburgh, PA  15222.

If no such Qualified Bid is received by the Bidding Deadline, then the Auction will not be held. Purchaser will be deemed the Successful Bidder, the Agreement will be the Successful Bid, and the Debtor will seek approval of an authority to consummate the Proposed Sale contemplated by the Agreement.

The Auction shall be conducted according to the following procedures:

o *Participation at the Auction.* Only a Qualified Bidder that has submitted a Qualified Bid is eligible to participate at the Auction. Only the authorized representatives of each of the Qualified Bidders, the Debtor and the Committee shall be permitted to participate in the Auction. During the Auction, bidding shall begin initially with the highest Qualified Bid (the "Opening Qualified Bid") and subsequently continue in minimum increments of at least $200,000.

o *William Blair Will Conduct the Auction:.* At the start of the Auction, the Debtor and the Committee shall describe the terms of the Opening Qualified Bid. The determination of which Qualified Bid constitutes the Opening Qualified Bid shall take into account any factors the Debtor and the Committee agree to be reasonably relevant to the value of the Qualified Bid to the estate, including, among other things, the following: (i) the amount and nature of the consideration; (ii) the proposed assumption of any liabilities; (iii) the ability of the Qualified Bidder to close the proposed transaction; (iv) the likelihood, extent and impact of any potential delays in closing; (v) any purchase-price adjustments; (vi) the impact of the contemplated transaction on any actual or potential litigation; (vii) the net economic effect of any changes from the Agreement, contemplated by the contemplated transaction documents; (viii) the net after-tax consideration to be received by the Debtor's estate; and (ix) such other considerations the Debtor and the Committee deem relevant in their mutual discretion (collectively, the "Bid Assessment Criteria"). All Bids made thereafter shall be Overbids (as defined below), and shall be made and received on an open basis, and all material terms of each Bid shall be fully disclosed to all other Qualified Bidders. A transcript of all Bids made and announced at the Auction, including the Baseline Bid, all Overbids and the Successful Bid will be maintained by a court reporter selected by the Debtor.

o *Terms of Overbids.* An "Overbid" is any Bid made at the Auction *subsequent* to the Debtor's announcement of the highest and best Qualified Bid. To submit an Overbid for purposes of the Auction, a Qualified Bidder must comply with the following conditions:

▪ Minimum Overbid Increment – Any Overbid after the Opening Qualified Bid shall be made in increments of at least $200,000 (or such other amount determine by the Debtor in consultation with the Committee to facilitate the Auction). Additional consideration in excess of the amount set forth in the Baseline Bid must be comprised only of cash consideration.

- Remaining Terms are the Same as for Qualified Bids – Except as modified herein, an Overbid must comply with the conditions for a Qualified Bid set forth above, provided, however, that the Bidding Deadline and the Initial Minimum Overbid Increment shall not apply. Any Overbid made by a Qualified Bidder must remain open and binding on the Qualified Bidder until and unless (i) the Debtor and Committee accepts a higher Qualified Bid as an Overbid and (ii) such Overbid is not selected as the Back-up Bid (as defined below).

  To the extent not previously provided, a Qualified Bidder submitting an Overbid must submit, as part of its Overbid, written evidence (in the form of financial disclosure or credit-quality support information or enhancement acceptable to the Debtor, and the Committee) demonstrating such Qualified Bidder's ability to close the transaction proposed by such Overbid.

- *Closing the Auction.* At conclusion of the bidding, the Auction shall be closed, and the highest and best offer for the Assets shall be identified (the "Successful Bid") along with the entity submitting such Bid (the "Successful Bidder"). The next highest and otherwise best offer after the Successful Bid shall also be identified (the "Back-up Bid") and the Qualified Bidder making such Bid (the "Back-up Bidder") shall be notified of such determination.

- *Break-up Fee.* In the event that the Agreement is terminated pursuant to Section 9.1(b), Section 9.1(e), Section 9.1(h) or Section 9.1(i) of the Agreement, then, in addition to the immediate return of the Purchaser's Deposit, the Break Up Fee will be payable to the Purchaser on the occurrence of an Alternative Transaction.

- <u>Acceptance of Successful Bid/Sale Hearing</u>. The Movants will request at the Consolidated Confirmation Hearing that the Bankruptcy Court confirm the Plan and approve the agreement of the Successful Bidder. The Debtor will sell the Assets to the Successful Bidder on the Effective Date of the Plan, which in no event will be later than August 31, 2010 unless otherwise agreed by the Movants and PNC Bank, as Agent.

- <u>As Is, Where Is</u>. The sale of the Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature or description by the Debtor, its agents or estate except to the extent set forth in the Agreement or the agreement of another Successful Bidder. Each Qualified Bidder (including Purchaser) shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its offer, that it has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Assets in making its Bid, and that it did not rely on any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly

stated in the Bidding Procedures or (i) as to Purchaser, the terms of the sale of the Assets shall be set forth in the Agreement, or (ii) as to another Successful Bidder, the terms of the sale of the Assets shall be set forth in the applicable asset purchase agreement.

- <u>Free of Any and All Encumbrances</u>.  Except as otherwise provided in the Agreement or another Successful Bidder's asset purchase agreement, all of the Debtor's right, title and interest in and to the Assets subject thereto shall be sold free and clear of all Interests.

22.     The Movants submit that the implementation of the Procedures, including the Break-up Fee, will not chill bidding for the Assets.  To the contrary, approval of the Procedures will invigorate bidding.  As set forth above, William Blair has employed substantial marketing efforts aimed at garnering interest in the Assets and, as of the date of this Motion, approximately 180 total potential financial and strategic buyers have been contacted and 58 have shown some level of interest in purchasing the Assets.  While the Debtor and the Committee have determined that at this point in time the transaction proposed by Purchaser pursuant to the Agreement provides the best result for the Debtor and its estate, the Procedures provide a structure and format that encourages all bidders to submit the highest and best offers for the Assets. Accordingly, the Movants submit that the Procedures are in the best interests of the Debtor, its estate and its creditors.

**B.      Proposed Notice of Consolidated Confirmation Hearing and Sale Objection Deadlines**

23.     The Movants have filed a motion requesting interim approval of the disclosure statement and a consolidated hearing on the final approval of the disclosure statement and confirmation of the joint chapter 11 plan contemporaneously with the filing of this Motion.  The Movants request that the Consolidated Confirmation Hearing pursuant to the proposed consolidated process occur on or about August 9-13, 2010, with a sale/plan objection deadline of five (5) days prior to such Consolidated Confirmation Hearing (the "<u>Sale and Plan Objection Deadline</u>").

24.     Not later than two (2) days after the Bankruptcy Court approves the Procedures, and the Scheduling Order relating to the Consolidated Confirmation Hearing, the Movants will cause notice of the same to be served on: (i) all entities that claim any interest in, or lien on, the Assets; (ii) all parties to executory contracts and unexpired leases subject to the Proposed Sale; (iii) all governmental taxing authorities that have, or as a result of a sale of the Assets may have, claims, contingent or otherwise, against the Debtor; (iv) all parties that filed requests for notices under Bankruptcy Rule 9010(b) or are otherwise entitled to notice under Bankruptcy Rule 2002; (v) all known creditors (whether liquidated, contingent or unmatured) of the Debtor; (vi) all interested governmental entities; (vii) the Office of the United States Trustee; and (viii) all entities originally contacted by William Blair. The Movants submit that such notice is fair and proper under the circumstances.

**C.      Proposed Assumption of Contracts/Leases and Cure Dispute Resolution Process**

**(i)      *Cure Amount Notice***

25.     To facilitate the assumption and assignment of any executory contracts or unexpired leases, the Movants will serve a notice (the "Cure Amount Notice"), not later than two (2) days after the Bankruptcy Court approves the Procedures and enters the Scheduling Order on each counterparty to executory contracts and unexpired leases that are listed in Schedule 2.3 of the Agreement.  The Cure Amount Notice will include Schedule 2.3 of the Agreement.

26.     If Purchaser is not the Successful Bidder, and an alternative Successful Bidder is seeking to assume the executory contracts and unexpired leases other than as listed in Schedule 2.3 to the Agreement, as part of an Alternative Transaction, the Debtor will provide notice to all non-debtor parties to such contract counter-parties immediately following the Auction via overnight courier, facsimile and/or electronic mail.

27.     The Movants submit that the Cure Amount Notice is appropriate under the circumstances as the extended deadline to assume or reject executory contracts and unexpired non-residential leases is fast-approaching and such agreements are valuable assets of the Estate and necessary to the Proposed Sale.

**(ii)     *Cure Disputes*[7]**

28.     The Movants will attach to the Cure Amount Notice their calculation of the undisputed cure amounts they believe must be paid to cure all defaults under all of the Acquired Contracts (the "Cure Amounts").   If no amount is listed on the Cure Amount Notice, the Movants submit that there is no Cure Amount due to such parties.

29.     Counter-parties whose executory contracts and unexpired leases have been designated for assumption and assignment will have fourteen (14) days (but no later than August 2, 2010) from the date of receipt of the Cure Amount Notice, which will include Schedule 2.3, to file an objection with the Bankruptcy Court.

30.     The following process shall govern disputes relating to Cure Amounts:

(A)     Counterparties to any executory contracts and unexpired leases (I) designated for assumption and (II) that dispute the proposed Cure Amount or otherwise dispute assumption and assignment of an Acquired Contract for any other reason must serve counsel to the Debtor, the Purchaser and the Committee any objection to the proposed Cure Amount ("Cure Objection") so that it is received no later than August 2, 2010.

(B)     The Cure Objection should include: (1) the amount of the proposed cure claim asserted by the objecting contract counter-party; (2) documentation that substantively and quantitatively supports the cure claim alleged by the objecting contract-counter party; (3) contact information of the counterparty (including but not limited to email, fax and telephone numbers at which the counterparty can be reached), and (4) the legal and factual basis for an objection to assumption and assignment of a proposed Acquired Contract.

---

[7] The Cure Dispute Resolution Process set forth herein is intended to mirror that proposed in the Plan.  To the extent the process set forth herein and that set forth in the Plan conflict, the process set forth in the Plan shall control.

(C)     The Debtor (in consultation with the Committee), Purchaser and the objecting counterparty will promptly, following receipt of the Cure Objection, commence good faith negotiations of the Cure Objection.

(D)     If a Cure Objection dispute cannot be resolved within three (3) days before the Consolidated Confirmation Hearing, the Debtor will file a notice of disputed cure ("Cure Dispute Notice") with the Bankruptcy Court and Cure Objection disputes will be addressed by the Bankruptcy Court prior to the conclusion of the Consolidated Confirmation Hearing.

(i).     Hearings on Cure Objections may be held at (i) the Consolidated Confirmation Hearing, or (ii) on such earlier date that the Movants mutually determine with Court approval; provided, however, that if the subject executory contract or unexpired lease is assumed and assigned, the Cure Amount asserted by the objecting party (or such lower amount as may be fixed by this Court) shall be deposited and held in a segregated account by the Debtor or the Successful Bidder or any other assignee pending further order of this Court or mutual agreement of the parties, as applicable.

(E)     The Purchaser may delete executory contracts and unexpired leases from Schedule 2.3 and the Cure Dispute Notice at any time up to the submission by the Plan Proponents of a proposed confirmation order to the Court.

(F)     Failure to comply with the Cure Objection dispute resolution process will result in the Cure Amount being deemed an allowed claim as proposed in the Cure Amount Notice.  The contract counterparty will be forever barred, estopped, and enjoined from asserting a cure claim in an amount that exceeds the amount listed in the Cure Amount Notice and Schedule 2.3 of the Agreement.  The Debtor, with approval of the Purchaser and Committee, may settle any Cure Objection without any further notice to or action, order, or approval of the Bankruptcy Court.

(G)     In the event of an Alternative Transaction, notice provided to counterparties to contracts not identified on Sechedule 2.3 of the Agreement as of the date of the Auction shall have until the Consolidated Confirmation Hearing to assert a Cure Objection.

31.     The Debtor's decision to assume and assign any executory contract or unexpired lease shall be subject to Court approval and consummation of the Proposed Sale of the Assets. Absent consummation of the Proposed Sale of the Assets, each such contract or lease shall neither be deemed assumed nor assigned and shall in all respects be subject to further administration under the Bankruptcy Code and any applicable order of this Court.

32.     Except as otherwise provided in the Agreement or any agreement reached with an alternative Successful Bidder, subject to any prepetition cure amount payments, the assignee of any executory contract or unexpired lease will not be subject to any liability to the counterparty to said contract or lease that arose before the closing date of the Proposed Sale of the Assets, and the Debtor shall be relieved of any and all liability accruing or arising thereafter pursuant to section 365(k) of the Bankruptcy Code.

## BASIS FOR RELIEF

**A.      Approval of the Sale Procedures is Warranted Under Bankruptcy Code 363(b)**

33.     Bankruptcy Code Section 363(b)(1) provides that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).

34.     Once the Debtor's articulate a valid business justification for a sale outside of the ordinary course of business, the business judgment rule dictates that the Court should not second-guess the Debtor's business judgment.  The business judgment rule "is a presumption that in making a business decision the directors…acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the corporation." Brehm v. Eisner, 746 A.2d 244, 264, n. 66 (Del. 2000) (quoting Aronson v. Lewis, 473 A.2d 805, 821 (Del. 1984); In re Tower Air, Inc., 416 F.3d 229, 238 (3d Cir. 2005); Holders of Tectonic Network, Inc. v. Wolford, 554 F.Supp.2d 538, 555, n. 111 (D. Del. 2008); Continuing Creditors' Comm. of Star Telecomms., Inc. v. Edgecomb, 385 F. Supp. 2d 449, 462 (D. Del. 2004); see also In re Johns-Manville Corp., 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions").

35.     The Debtor has a sound business judgment for selling the Assets at this time and in the manner proposed.  Based on the results of their analysis of the Debtor's ongoing and future business prospects, the Debtor's management team, headed by A&M, the Court-appointed Chief Restructuring Officer, has concluded that a sale of the Assets in accordance with the procedures set forth in the Bidding Procedures is likely the best method to maximize recoveries to the Debtor's estate.  Maximization of the Assets' value is a sound business purpose warranting authorization of the Proposed Sale.

36.     The Proposed Sale of the Assets will be subject to competing bids, enhancing the Debtor's ability to receive the highest or otherwise best value for the Assets.  Consequently, the fairness and reasonableness of the consideration to be received by the Debtor will ultimately be the product of the market for the Assets and demonstrated by a market check via the Auction.

**B.     The Bidding Procedures are Fair and are Designed to Maximize the Value Received for the Assets**

37.     Section 105(a) of the Bankruptcy Code provides that the Court "may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title."   11 U.S.C. § 105(a).  The Movants submit that the Procedures are appropriate under section 105, and also under sections 1123 and 1129, of the Bankruptcy Code to ensure that the bidding process is fair and reasonable and will yield the maximum value for its estate and creditors.  The Procedures proposed herein are designed to maximize the value received for the Assets by facilitating a competitive process in which bidders may participate and submit competing bids in accordance with sections 363 and 1123.  The Procedures provide potential bidders with sufficient notice and an opportunity to acquire information necessary to submit a timely and informed bid.  At the same time, the Procedures provide the Movants with the

opportunity to consider all competing offers and to select the highest and best offer for the Assets as determined by the Movants in consultation with PNC Bank, as Agent.

38.     The Movant request this Court's approval of the Procedures, including the dates established thereby for the Auction and the hearing on the Proposed Sale.  With such approval, the Movants and all parties in interest can be assured that the consideration paid for the Assets will be fair and reasonable, and that there is a sound business reason to approve the Procedures.

**C.     The Bid Protections are Necessary to Preserve the Value of the Debtor's Estate**

39.     Pursuant to Bankruptcy Rule 6004(f)(1), a sale of property outside the ordinary course of business may be held by private sale or public auction.  The Movants submit that providing the Bid Protections to Purchaser will maximize the realizable value of the Assets for the benefit of the Debtor's estate, creditors and other parties-in-interest.

40.     In Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527 (3d Cir. 1999), the United States Court of Appeals for the Third Circuit (the "Third Circuit") held that even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions, the administrative expense provisions of section 503(b) of the Bankruptcy Code govern in the bankruptcy context.  Accordingly, to be approved, bidding incentives must provide some benefit to the debtor's estate.  Id. at 533.

41.     The Third Circuit identified at least two instances in which bidding incentives may benefit the estate.  First, benefit may be found if the bidding procedures and protections "promote" more competitive bidding, such as by inducing a bid that otherwise would not have been made without which bidding would have been limited."  Id. at 537.  Second, where the availability of bidding incentives induce a bidder to research the value of the debtor and submit a bid that serves as a minimum or floor bid on which other creditors can rely, "the bidder may

have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." Id.

42.     In the instant matter, the Bid Protections are necessary to induce Purchaser to continue to move toward consummation of the sale contemplated in the Agreement and the joint chapter 11 plan.  Without the Bid Protections, Purchaser will not agree to move forward with its bid as set forth in the Agreement and the Debtor will be forced to explore alternative options, which the Movants submit is highly unlikely to bring as much value to the Debtor's estate and creditors.  Furthermore, moving forward with the Agreement, the terms of which were the result of extensive arm's length negotiation and effort by the Movants and the Purchaser, will create a floor from which the Movants will be better able to insist that competing bids be materially higher or otherwise better (as illustrated by a blackline of any such competing bid against the Agreement), a clear benefit to the Debtor's estate.

43.     Finally, the Bid Protections were negotiated in good faith and were the product of arm's-length negotiations.  Accordingly, the Movants request that the Court approve the Bid Protections.

**D.      The Proposed Procedures for Assumption and Assignment of Executory Contracts and Unexpired Leases Should Be Approved**

44.     To facilitate and effectuate the Proposed Sale of the Assets, the Debtor seeks authority to assume and assign executory contract or unexpired leases designed for assumption and assignment to the Successful Bidder (or the Back-up Bidder) to the extent required by such Successful Bidder (or Back-up Bidder) under the procedures proposed herein.  Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory contracts and unexpired leases, subject to the approval of the Bankruptcy Court, provided that the defaults under such contracts and leases are cured and adequate assurance of future performance is

provided. A debtor's decision to assume or reject an executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment. Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co., 318 U.S. 523 (1943) (applying Bankruptcy Act section 77, subsection (b), the predecessor to section 365 of the Bankruptcy Code) (rejecting the test of whether the executory contract was burdensome in favor of whether rejection is within the debtor's business judgment); see also e.g., Sharon Steel Corp. v. National Fuel Gas Distribution Corp., 872 F.2d 36, 39-40 (3d Cir. 1989) (citing Wheeling-Pittsburgh Steel Corp. v. West Penn Power Corp. (In re Wheeling-Pittsburgh Steel Corp.), 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987)).

45.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." See Carlisle Homes, Inc. v. Azzari (In re Csrlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1989). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance present when the prospective assignee of a lease from the debtors has the financial resources and has expressed a willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding; "chief determinant of adequate assurance of future performance is whether rent will be paid").

46.     It is highly likely that the Successful Bidder (or the Back-up Bidder) will desire to take assignment of substantial executory contracts and unexpired leases of the Debtor. To the extent this is true, the Debtor submits that it can and will demonstrate that all requirements for assumption and/or assignment of such executory contract or unexpired leases will be satisfied at

the Consolidated Confirmation Hearing under the proposed procedures. The Movants, as required by the Procedures, will evaluate the financial wherewithal of all potential bidders before qualifying such bidders to bid for the Assets.

47. Further, for the reasons stated throughout this Motion, the Debtor, in exercising its sound business judgment, submits that selling the Assets and assuming and assigning to the Successful Bidder (or the Back-up Bidder) the executory contract or unexpired leases is in the best interest of its estate and all parties to executory contracts or unexpired leases will be afforded an adequate opportunity to be heard. The Cure Amount Notice will be served on all counterparties to the executory contracts or unexpired leases within two (2) days of the date the Bankruptcy Court approves the Procedures and enters the Scheduling Order. The proposed procedures will provide any party objecting to the potential assumption and assignment of its contract or lease ample time to do so. If an Auction is conducted, a notice identifying the Successful Bidder (if it is not Purchaser) will be sent via overnight courier, facsimile and/or electronic mail to all affected parties to the executory contract or unexpired leases within 24 hours of the conclusion of the Auction. At that point, such counterparties may object to the assumption and assignment of the applicable executory contract or unexpired leases solely on the issue of whether such Successful Bidder can provide adequate assurance of future performance as required by section 365 of the Bankruptcy Code up to the time of the Consolidated Confirmation Hearing.[8] If any party has timely asserted an objection to the sufficiency of assurance of future performance by the proposed assignee and such objection has not been

---

[8] If a Successful Bidder (other than Purchaser) adds additional executory contracts or unexpired leases to the Assumed Contracts, counterparties to such additional Assumed Contracts may also object to the cure amount associated with the applicable Assumed Contract.

withdrawn or resolved by the date of the Consolidated Confirmation Hearing, the Debtor requests that this Court conduct a further hearing on such adequate assurance objections.

48.     Accordingly, the Debtor requests that the assumption and assignment procedures set forth above be approved.

**E.     Relief from the Fourteen-Day Waiting Periods Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate**

49.     The Movants hereby requests that the Court waive the fourteen (14) day stay period under Bankruptcy Rules 6004(h) and 6006(d).

<u>**NOTICE**</u>

50.     The Movants propose to give notice of this Motion by overnight or facsimile or electronic mail to: (i) the Office of the United States Trustee; (ii) counsel to Purchaser; (iii) counsel to Agent for Pre-Petition Lender; and (iv) those parties requesting notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, the Movants submit that no other or further notice is necessary.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

WHEREFORE the Movants respectfully request: (i) entry of the proposed Sale Procedures Order, substantially in the form submitted herewith; and (ii) such other and further relief as this Court deems just and proper.

Respectfully submitted,

Date: July 9, 2010

_____/s/ Robert O. Lampl_____
Robert O Lampl (PA I.D. #19809)
John P. Lacher (PA I.D. #62297)
Elsie R. Lampl (PA I.D. #208867)
960 Penn Avenue, Suite 1200
Pittsburgh, PA 15222
(412) 392-0330 – Phone
(412) 392-0335 – Fax

*Counsel for the Debtor*

and

**MCGUIREWOODS, LLP**

___/s/ Michael J. Roeschenthaler__
Mark E. Freedlander, Esq.
Michael J. Roeschenthaler, Esq.
625 Liberty Avenue, 23rd Floor
Pittsburgh, PA 15222
(412) 667-6000

*Counsel to the Official Committee
of Unsecured Creditors*

12919111.1