UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

---------------------------------------------------------------x  Case No. 09-27807-MBM

In re:                                                            Chapter 11

MAX & ERMA'S RESTAURANT, INC.                                     Document No.

        Debtor.          Hearing Date and Time:

---------------------------------------------------------------x  July 21, 2010 at 2:00 p.m.

**OBJECTION OF PFIFE HUDSON GROUP, INC. TO JOINT MOTION
FOR ENTRY OF AN ORDER (I) APPROVING BIDDING PROCEDURES
FOR SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS; (II)
SCHEDULING A HEARING TO CONSIDER THE SALE AND APPROVING THE
MANNER OF NOTICES; (III) APPROVING CERTAIN BID PROTECTIONS;
AND (IV) ESTABLISHING PROCEDURES FOR THE ASSUMPTION AND
ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

Pfife Hudson Group, Inc. ("Pfife") hereby objects to approval of the Joint Motion for Entry of an Order (I) Approving Bidding Procedures for Sale of Substantially All of the Debtor's Assets; (II) Scheduling a Hearing to Consider the Sale and Approving the Manner of Notices; (III) Approving Certain Bid Protections; and (IV) Establishing Procedures for Assumption and Assignment of Certain Executory Contracts and Unexpired Leases (the "Motion") [Docket No. 762].[1] In support of its objection, Pfife respectfully states:

## OBJECTIONS

### I. PFIFE HAS A BETTER PROPOSAL THAT WILL PROVIDE A HIGHER RECOVERY TO CREDITORS

1. As outlined below, Pfife has submitted a non-binding term sheet (the "Pfife Proposal") to the Debtor, the Official Committee of Unsecured Creditors (the "Committee" together with the Debtor, the "Movants") and counsel to PNC Bank, National Association, the

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

{B0217805.1}

administrative agent for the pre-petition secured lenders (the "Agent").[2] The Pfife Proposal, attached hereto as Exhibit 1, is a superior bid including in the following ways:

- It provides total consideration of approximately $32.704 million.

- It provides 100% cash recovery on the effective date of the Pfife sponsored plan to holders of Senior Lender Claims.

- It provides a 15% cash recovery to holders of General Unsecured Claims on the Effective Date, subject to certain specified adjustments.

- It provides holders of Unsecured Trade Creditor Claims (as defined in the Pfife Proposal) an option of a 20% cash recovery over time, provided such creditors agree to extend normal trade credit for at least one year after the Effective Date.

- It provides for a treatment of the G&R Acquisition Claim and Gary L. Reinert, Sr. Claim (each as defined in the Pfife Proposal) in a collaborative manner that avoids litigation costs.

## II. THE BIDDING PROCEDURES DO NOT PROVIDE A LEVEL PLAYING FIELD

2. The proposed bidding procedures do not provide a level playing field in several key regards. First, the proposed break-up fee is contrary to Third Circuit precedent. Second, the proposed "stalking horse" transaction is not properly formulated to encourage competitive bidding. Third, the proposed procedures themselves are unfair. Any one of these flaws warrant denial of the Motion; in the aggregate, however, they seem to outline a scheme to chill bidding and thwart efforts to maximize the value of the Debtor's assets for the benefit of its creditors.

---

[2] The Pfife Proposal contemplates cooperation from Gary Reinert, Sr.

{B0217805.1} - 2 -

### A. The Break-Up Fee is Unnecessary

3. To merit receipt of a break-up fee, a proposed bid must be designed to maximize the value of the estate by promoting a genuine auction and enhancing competition. The purpose of the fee is to encourage an able, but not quite willing, bidder to make the first offer for the asset and thereby start the bidding process. *See In re O'Brien Environmental Energy, Inc.*, 181 F.3d 527, 537 (3d Cir. 1999) ("*O'Brien*"); *see also In re Marrose*, 1992 WL 33848 at *5 (Bankr. S.D.N.Y. Feb. 15, 1992) (same).

4. Thus, the relevant inquiry is whether approval of a break-up fee will "serve [ ] as a catalyst to higher bids." *O'Brien*, 181 F.3d at 537; *In re Beth Israel Hosp. Ass'n of Passaic*, No. 06-1686, 2007 WL 2049881, at *13 (Bankr. D. N.J. July 12, 2007). When undertaking that analysis, the standard is not whether a break-up fee is within the *business judgment* of the debtor, but whether the transaction will further the diverse interests of the debtor and creditors. *See, e.g., In re Lionel Corp.*, 722 F.2d 1063, 1071 (2nd Cir. 1983). Stated simply, the proposed break-up fee must be carefully scrutinized to insure that it actually benefits the debtor's estate and covers only "actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b); *O'Brien*, 181 F.3d at 535; *In re Reliant Energy Channelview LP*, 594 F.3d at 205-206.

5. Application of the aforementioned standard to the Motion demonstrates that the Motion should be denied. As a threshold matter, other than reciting the legal standard for approving a break-up fee, the Movants fail to offer any evidence of the need for such a fee in this case.

6. Specifically, the Motion belies the predicate for a break-up fee because the Movants assert that they have already held an "out of court auction." (Motion at ¶ 14 (asserting that "Essentially, an out of court auction was conducted by the Debtor and the Committee....").) Indeed, the Motion discloses that three alternative potential purchasers actively participated in

this "out of court auction" (for which procedures were never approved by this Court) and "actively negotiated letters of intent." Thus, the proposed transaction could not be viewed as the "catalyst" for inducing interest in the Debtor's assets. (*Id.*)

7. Additionally, the Motion is clear that it was the efforts of the Debtor's investment banker, *not* the public disclosure of the proposed transaction with the Purchaser, that led to interest in the Debtor's assets. (*Id.* at ¶ 13 (stating that "William Blair contacted approximately 180 potential financial buyers and 49 potential strategic advisors regarding the Max & Erma's opportunity.").) Those efforts purportedly led to the execution of 58 confidentiality agreements and the submission of seven letters of intent. (*Id.*) *See In re America West*, 166 B.R. 908, 912-13 (Bankr. D. Ariz. 1994) (finding that approval of a break-up fee not in the best interests of debtor's estate where record demonstrated that competing offers were due to debtor's "thorough marketing" of assets to approximately 100 prospective bidders).

8. Given the interest already expressed in the Debtor's assets by multiple parties, at a time when no incentive would be provided, there is no need to provide any incentive now. *See In re Beth Israel Hosp. Ass'n of Passaic*, 2007 WL 2049881, at *13; *Gey Assocs. Gen'l P'ship v. 301 Assocs LP*, No. 02 Civ 0710, 2002 WL 31426344, at *2 (S.D.N.Y. Oct. 29, 2002) (affirming bankruptcy court order denying break-up fee because there were multiple parties already interested in the assets).

9. In support of its Motion, the Debtor asserts that a break-up fee is "necessary to induce Purchaser to continue to move toward consummation of the sale" contemplated by the Motion. (Motion at ¶ 42). However, this argument previously has been soundly rejected by the Third Circuit in *O'Brien* and more recently in *Reliant Energy*. The Third Circuit explained that:

> [W]hile we understand that the first bidder may be motivated in part to submit its bid by the possibility that it will receive a break-up fee, it does not follow from that motivation that the bidder will withdraw its bid, pass up on the opportunity to acquire the asset to

{B0217805.1} - 4 -

be sold, and nullify its work in preparing its bid if a court, when ordering that there be an auction of assets, declines to authorize a break-up fee to be paid to the initial bidder. Surely *O'Brien* makes that clear because even though Calpine had made its bid contingent on the award of a break-up fee, it competed at the auction after the Bankruptcy Court rejected the request for a break-up fee.

*In re Reliant Energy Channelview LP*, 594 F.3d at 207.

10. Based on the foregoing reasons, Pfife submits that there is no basis to provide a break-up fee to the Purchaser and that granting it here is designed to chill the bidding, is unfair to other bidders and is needlessly costly to the estate and its creditors.

### B. The Proposed Transaction Is Vague Making Bidding Against It Difficult

11. The proposed bid is vague to the point of being effectively incomprehensible, making it difficult for prospective bidders to know what they are bidding against.

12. First, the Asset Purchase Agreement states that the "monetary value" of the "Total Consideration" for the Debtor's assets is $24,854,516, however, the Asset Purchase Agreement fails to detail how that figure is derived. Only $14,750,000 of the Total Consideration consists of a cash payment. Bidders are left to guess and estimate the source and use of the remaining $10 million of so-called "monetary value".

13. Second, the Debtor's disclosure statement and Plan state that recovery to the general unsecured creditors is between 10-20%, but it is unclear how that figure is derived. By way of example, $12 million of the $14,750,000 cash payment is payable to the Debtor's first priority secured lenders. The remaining $2,750,000 will be paid into the creditor trust to be established under the Plan. However, the $2,750,000 payment to is potentially subject to a number of deductions. Additionally, the Purchaser is required to provide the creditor trust a note equal to $2.5 million (the "M&E Note"); however, the face amount of the note is potentially subject to a number of deductions. Given the likelihood of the *res* -- or initial deposit to the

creditor trust -- being severely reduced by the various unquantified deductions allowed under the Asset Purchase Agreement, it is hard to estimate the starting value of the creditor trust. Therefore, it is difficult to comprehend the Debtor's estimated recovery of 10-20% to general unsecured creditors.

14. Further, even assuming that the neither the M&E Note or initial cash payment to the creditor trust are reduced, distributions are subject to large cuts *before* general unsecured creditors receive a single cent of recovery. First, the expenses and fees of the proposed trustee of the creditor trust is entitled to first priority payment. On the face of the trust documents, it appears that the trustee will earn a flat fee and a contingency fee, but no schedule setting forth the amounts has been provided. Second, the first 75% of the first $1.3 million available to paid from the creditor trust, after a reduction for the trustee's fees, will be paid to the secured creditors, and only 25% will be paid to the general unsecured creditors. Thereafter, until secured creditors have been paid in full, 60% of all payments from the creditor trust, after a reduction for the trustee's fees, will be paid to the secured creditors, and only 40% will be paid to the general unsecured creditors. Without knowing the exact amount to be deposited and the fees that such deposit is subject to it is nearly impossible to determine how the Debtor has derived the recovery estimate for its unsecured creditors based upon the Purchaser's bid. Moreover, to the extent that the Debtor's purported valuation of the Purchaser's bid is inflated, the competitive nature of the bidding process will be impeded.[3]

15. Third, the Asset Purchase Agreement states that the Purchaser is assuming certain cure payments and administrative claims, but the total amount of these assumed liabilities cannot be ascertained from the existing documentation. Moreover, it appears that some of these

---

[3] Pfife believes that the proposed transaction's opacity also poses serious disclosure issues for confirmation purposes, and reserves its right to object thereto at the appropriate time.

liabilities will be paid from the Debtor's cash-on-hand, in which case, the assumed liabilities should not count towards the value of the Purchaser's bid.

### C. The Purchaser Is Not A Qualified Bidder

16. The proposed transaction has two flaws that render the bid unacceptable and the Purchaser not a "Qualified Bidder" pursuant to the proposed bidding procedures.

17. The Debtor has filed a motion seeking expedited relief with respect to the sale of substantially all of its assets and a related motion expediting the confirmation process. The basis for the rush, supposedly, is that the Debtor's deadline to assume or reject non-residential real estate leases will expire on August 31, 2010. Thus, the Debtor asserts it needs this Court to expeditiously authorize its sale process to ensure that the Debtor will reorganize. Key to this effort is having an irrevocable bid that is certain to close. However, that is not what the Debtor has presented to the Court.

18. Section 9.1(a) of the Asset Purchase Agreement provides the Purchaser with unequivocal right to terminate the agreement at *any* time prior to the "the 36th day following the Execution Date." This walk-away right is not bound by any conditions or terms and may be exercised without provocation -- in other words the Purchaser could just leave. Such an unlimited right to terminate is clearly contrary to the Debtor's stated purpose for commencing and expediting this process. Under the circumstances, the Purchaser should not be deemed a "Qualified Bidder" and, as stated above, should not be awarded any bidding protections.

19. Additionally, the proposed consideration under the Purchaser's bid appears woefully insufficient to meet the requirements of the asset Purchase Agreement and would render the Debtor's proposed plan not feasible. Although the proposed bid is opaque, there are a few numbers that draw attention.

20.     The Purchaser proposed to pay $14.75 million cash and expects the Debtor to have an additional $3.5 million of cash on hand. Also on the Closing Date, the Purchaser proposes to provide a $12 million payment to the secured creditor, pay up to $2.5 million in administrative expenses, pay approximately $4.72 million in lease cure amounts, pay up to $90,000 in non-lease related cure amounts and $2.75 million to the creditor trust. This arithmetic does not work. On the Closing Date, the Purchaser will have at most $18.25 million of cash to cover closing costs, but is obligated to make roughly $22.06 million in expenditures. The documents filed with the Court provide no explanation on how the shortfall will be bridged.

### D.     The Proposed Procedures Are Unfair and Improper

21.     The proposed bidding procedures lock the Debtor into a sale of its assets with no opportunity to propose an alternative transaction. Competitive bidders must conform precisely to the terms of the Asset Purchase Agreement. Such limitations are patently improper. Rather than encouraging additional bidders to come forward with their best offers, which may or may not comport with the Asset Purchase Agreement, bidders are required to formulate their proposals on identical terms. Thus, a bidder with a different structure is precluded from bidding even though such a bid might yield a higher return for the Debtor's creditors.

22.     To maximize the value of its estate and to ensure that the bidding process is not chilled, alternative bid structures should be encouraged and accepted.

### E.     The Bidding Timeline Should Be Extended

23.     The Debtor has pegged the sale process and auction to the confirmation of its proposed plan. Specifically, the Debtor has obtained authority to have a "Combined Confirmation Hearing" on August 11, 2010. The Debtor is requesting that a deadline to submit bids be set 10 days before the Combined Confirmation Hearing and that the auction be scheduled

2 days before the Combined Confirmation Hearing. The Debtor asserts that it must close a transaction on or before August 31, 2010.

24. Under the current proposal, bids will be due on August 1, 2010 and an auction will be held on August 9, 2010, a full 22 days before the "required" closing date.

25. Assuming that the August 31, 2010 proposed closing date is a real "drop dead" date for the Debtor, it does not justify the compressed timeline requested. Indeed, such a compressed timeline has the effect of chilling competition, not promoting active bidding to maximize value.

26. Moreover, it does not appear that August 31, 2010 is a real drop dead date. Given the rejection activity in this case, it is unlikely that the Debtor would need 3 weeks to assume the leases (the alleged cause of the emergent circumstances) pending a closing at which assignment can be effected.

27. Thus, again assuming that August 31, 2010 is a real drop dead date (which Pfife does not believe to be true), Pfife respectfully requests that the earliest the Court set the bidding deadlines as follows:

    Bidding Deadline: August 20, 2010

    Auction: August 24, 2010

    Combined Confirmation Hearing: August 25, 2010 (subject to Court availability)

    Closing Date: August 31, 2010

More time would be even better.

28. The foregoing schedule is the minimum that could be considered to be in the best interests of the estate and is consistent with the Debtor's fiduciary obligations to maximize value. Moreover, the proposed schedule will provide the Debtor the assurance that it needs with respect

to being able to fund its exit from bankruptcy, while providing prospective bidders an opportunity to perform due diligence and propose the best bids possible.

### III. CONCLUSION

Pfife respectfully requests that the Court (i) deny the Debtor's proposed bidding procedures to the extent that they (a) seek authority to provide the Purchaser a break-up fee, (b) deem the Purchaser a "Qualified Bidder", and (c) bind bidders to the precise format of the proposed transaction; and (ii) modify the bidding procedures to schedule the bid deadline no earlier than August 20, 2010 and the auction no earlier than August 24, 2010.

BABST, CALLAND, CLEMENTS and ZOMNIR, P.C.

Dated: July 19, 2010

By: _____
Norman E. Gilkey, Esquire
PA ID No. 34310
(412) 394-5626
ngilkey@bccz.com
Two Gateway Center, 7th Floor
Pittsburgh, PA 15222
Fax: (412) 394-6576

and

SONNENSCHEIN NATH & ROSENTHAL LLP
Peter D. Wolfson
Jo Christine Reed
1221 Avenue of the Americas, 24th floor
New York, New York 10020
T: (212) 768-6700
F: (212) 768-6800

Counsel to Pfife Hudson Group, Inc.